## O'Mara and Irving *versus* The Commonwealth.

1. In a capital case, a juror said : "I read accounts of this matter in the papers ; heard it talked about, I have formed an opinion I think from what I have read ; the opinion would follow me if I had no evidence against it into the jury-box ; if there was nothing to contradict these reports I should be of the same opinion : unless the evidence satisfied me that I had a wrong opinion I should hold to it. I have not formed an opinion which would influence me unless the evidence sustained it." Also, that notwithstanding the opinion he had formed he could decide on the guilt or innocence of the prisoners upon the evidence and that alone ; that he could give a verdict on the evidence uninfluenced by anything he had heard or seen. *Held*, that he was competent.

2. The proper practice is to examine jurors on their *voir dire* as to the opinions they have formed.

3. The deceased was a female who was found near a railroad track at a distance from her house, with many incised wounds. The theory of the Commonwealth was that she had been killed at her house and laid after death, near the track ;—she was "full of blood, plethoric." The doctor who made the *post mortem* examination, was asked "the condition of the body as to fulness or paucity of blood." *Held*, to be a proper question : it being to him as an expert on facts, and the quantity of blood likely to flow from such a female, having a bearing as to the place where death occurred.

4. A witness said, "I saw prisoner's wife when she came" (where body of deceased lay) ; "she said to prisoner if she had been at home this would not have happened ; prisoner made no reply to this." *Held*, not to be declarations of a wife against her husband, but a statement to the prisoner which is to be judged by his conduct and not by the declarations of the wife only.

5. The prisoner was a party to the occurrence and the declaration was a part of the *res gestæ*.

6. The court below charged that if the jury found an unlawful killing it was presumed to be murder, but not higher than the second degree until shown to be of the first degree. *Held* to be correct.

7. The presumption is not one of fact only.

8. Associate judges not learned in the law are not excluded from the Court of Oyer and Terminer by the new Constitution.

9. Commonwealth *v.* Drum, 8 P. F. Smith 18 ; Staup *v.* Commonwealth, 24 P. F. Smith 458, referred to and adopted.

March 12th 1874. Before AGNEW, C. J., SHARSWOOD, MERCUR and GORDON, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Oyer and Terminer of *Susquehanna county* : No. 291, to January Term 1874.

At the January Term 1874, of the court below, Daniel O'Mara and Patrick Irving were indicted for the murder of Mary O'Mara. The defendants pleaded "Not Guilty."

The trial commenced January 13th 1874, before Streeter, P. J., and Cook and Chapman, his associates, who were not learned in the law.

In impannelling the jury, Hugh N. Tingley was called as a juror. He said: "Read accounts of this matter in papers ; heard it talked about some. I have formed an opinion I think, from what I have read. That opinion would follow me if I had no evidence

[O'Mara *v.* Commonwealth.]

against it, into the jury-box. It would influence me if I heard no other evidence. If no evidence was given contradicting this evidence which I have heard I should be of the same opinion. I mean that if there was nothing to contradict these reports I should be of the same opinion. I mean that unless the evidence of defendants satisfied me that I had a wrong opinion, I should hold to it."

He was challenged for cause by defendants.

Being cross-examined, he said: "I have not formed an opinion from what I have heard that would influence me unless the evidence sustained it."

The court asked witness: "Notwithstanding the opinion you have formed, can you enter the jury-box and decide the guilt or innocence of the prisoners upon the evidence and that alone, uninfluenced by any impression or opinion, which you say you have formed?"

He answered: "Yes, the opinion, &c., would not influence or bias my judgment. I could give a verdict on the evidence uninfluenced by anything which I have heard or seen."

The challenge was overruled, defendants excepted, and a bill was sealed.

Two other jurors were challenged by the defendants for cause, the challenges overruled, and a bill of exceptions sealed for the defendant.

The body of Mary O'Mara was found on the morning of September 27th 1873, near the Montrose Depot on the Delaware and Lackawanna Railroad. Her feet were about a foot distant from the rail, and her head a little further down the track. The lower part of the arm, severed at the elbow, lay about ten or eleven feet above where the body lay. No blood was found either on the ground or on the rail. In going towards the house of the deceased blood was found in the road and also a lock of hair saturated with blood. There were also found the tracks of a wagon and oxen. The wagon of the defendant (O'Mara) was found near a bark pile, and on the bottom boards were spots of blood. Blood also had trickled down upon the axle of the wagon.

Strands of hair were found in the back end of the wagon. His oxen had been left in the yoke by O'Mara on the evening of the 26th in his lot near his house; on the next morning they were found in a lot near the bark pile unyoked, with their horns and necks smeared with blood. At the house fresh stains of blood were found in many places, on the floor, door and bed-clothes; foot-tracks of blood were found on the stairs; an attempt had been made to plane off the blood from the door; a plane was found with shavings in it moist with blood, and in the ashes of the stove cloth and partly burnt buttons were found.

On the night of the 26th the two defendants stayed at the house;

[O'Mara *v.* Commonwealth.]

the only other persons in the house were O'Mara's mother and the deceased, his sister.

In addition to evidence of the foregoing facts, Dr. C. C. Halsey, who also was coroner, testified, amongst other things, that the hair which was found corresponded with the hair of the deceased; that he had made a *post mortem* examination of deceased, assisted by Drs. Ainey and Birdsall, on the 2d of October, at the cemetery; he found many wounds on the head, face and arms of the deceased; witness described the wounds; the wounds on the face were made whilst living; on the right side he found six ribs fractured, they had been made on the dead body; on the left side two ribs had been fractured during life. "The shock of the blows on the head and face caused Mary O'Mara's death; strangulation may have aided in producing the fatal result. * * * The marks on the face were made by an iron or steel instrument not having a keen edge; the injuries could not have been made by a cow-catcher on a locomotive. * * * She was perhaps thirty years old, would weigh from 145 to 150 pounds; was full of blood, plethoric."

The counsel for the Commonwealth proposed to ask the witness the condition of the body as to fulness or paucity of blood. The defendants objected; the question was admitted, and bill of exceptions sealed.

The witness testified that at the *post mortem* examination one-half of the blood remained in the body; "the body would lose, in my opinion, from the cause mentioned, about six to eight pounds or pints of blood."

Thomas Killea, a track boss at Montrose depot, testified: "I saw the body of Mary O'Mara at the crossing on the morning of September 27th, lying on the side of the track. * * * The body was carried to the depot; saw Daniel O'Mara's wife when she came." Under objection and exception the witness further testified: "She said to Daniel, if she had been at home this would not have happened. Daniel made no reply to this."

The following were points of the defendants with their answers:—

1. When the circumstances accompanying a homicide are given in evidence, the question whether the crime is murder or manslaughter is to be decided upon the evidence, and not upon any presumption from the mere act of killing.

Answer: "We decline to charge as requested. We have already said that if you find an unlawful killing, it is presumed to be murder in some degree, unless the contrary appears in evidence. The presumption, however, rises no higher than murder in the second degree, until it is shown by the Commonwealth to be murder in the first degree."

2. If there be any such presumption, it is a presumption of fact; and if the evidence leads to a reasonable doubt whether the

[O'Mara v. Commonwealth.]

presumption be well founded, that doubt will avail in favor of the prisoners.

Answer: "We refuse to charge this proposition in the terms in which it is stated."

The verdict was that each of the defendants was "Guilty of murder in the first degree."

They moved for a new trial, and also in arrest of judgment, on the ground, that under the new Constitution the associate judges had no authority in the trial of cases in the Oyer and Terminer.

The motions were overruled, and the defendants were sentenced to be hung.

They took a writ of error, and assigned twelve specifications of error:—

1, 2, 3. Overruling their challenges to the jurors.
4. Admitting the question to Dr. Halsey.
5. Admitting the testimony of Thomas Killea.
10, 11. The answers to the points.
12. Not arresting the judgment.

*J. B. McCollum* and *W. H. Jessup* (with whom were *A. H. McCollum, H. C. Jessup* and *E. U. Smith*), for plaintiffs in error.

*R. R. Little* (with whom were —— *Blakeslee, W. C. Crossmann* and *I. E. Carmalt*, District Attorney), for Commonwealth, the defendant in error.

The opinion of the court was delivered, May 11th 1874, by

AGNEW, C. J.—It is unnecessary to discuss in this case more than a few of the twelve assignments of error. Of the three relating to the challenges of the jurors, that of H. N. Tingley for cause, raises the only serious question, and this we think is disposed of, against the prisoners, by the principles ruled in the case of Staup v. The Commonwealth, at the last term in Pittsburgh (24 P. F. Smith 458). It was there said that the opinion which should exclude a juror, must be one of a fixed and determined character, deliberately formed and still entertained; one that in an undue measure shuts out a different belief. This it was said is a prejudgment, and constitutes a bias too strong to make the juror a fair and impartial judge. It was held, therefore, that when the opinion of the juror has been formed upon the evidence given in a former trial, or where his opinion of the prisoner's guilt has become a fixed belief, it would be wrong to receive him. On the other hand, when his opinions or impressions are founded upon rumor or reports, or even newspaper statements, which the juror feels conscious he can dismiss; when he has no fixed belief or prejudice, and is able to say he can fairly try the prisoner on the evidence, and freed from the influence of such opinions or impressions, he ought not to be

[O'Mara *v.* Commonwealth.]

excluded.   The reasons, indeed absolute necessity, for settling upon this middle ground in the selection of jurors, were stated at large in that case, and the distinction was fully set forth between a prejudgment, and also an opinion formed upon the evidence, which necessarily exclude an impartial consideration of a cause, and those imperfect opinions and floating impressions derived from sources known to be unauthentic, and to be liable to be removed by the evidence in the cause itself.   Taking all that the juror Hugh N. Tingley said in his examination, his opinion fell into the latter class.   It was not a prejudgment, or an opinion made up from evidence known to be authentic and such as would be given in the trial; but it was one founded only on hearsay, and ready to give way to the truth as it would appear in the evidence.   He said he had read accounts of this matter in the papers.   Heard it talked about some.   Formed an opinion he *thought.*   That opinion would follow him into the jury-box, if he had no evidence against it. Would influence him if he had no other evidence.   The remainder of the examination in chief is but a repetition of the same thought. In his cross-examination, he said he had *not* formed an opinion from what he had heard, that would influence him, unless the evidence sustained it.   And in reply to a question of the judge, whether he could enter the jury-box and decide the guilt or innocense of the prisoners upon the evidence, and that *alone,* uninfluenced by any impression or opinion he had formed; he said he could, and that the opinion would not influence or bias his judgment.   This case presents a test of the principles laid down in Staup *v.* The Commonwealth; and we must either recede, and go back to the practice of an age when ignorance of passing events constituted a characteristic of the times, and exclude every juror who has formed any opinion, even the slightest; or we must stand abreast with the present age, when every remarkable event of to-day is known all over the country to-morrow, and exclude those only whose opinions are so fixed as to be prejudgments, or have been formed upon the known evidence in the cause.   It is needless to say the world moves and carries us with it, and if we lag behind we must commit the trial of the most important causes in life to those, so ignorant, their dark minds have never been smitten by the rays of intelligence.   It may be well to remark while on this subject, the proper practice is to examine jurors upon their *voir dire* as to the opinions they have formed.   The tendency is to exaggerate their opinions, to escape serving in capital cases.

The fourth assignment of error was pressed strongly by the counsel, but we think in a misapprehension of the true tendency of the offer, which was to show what quantity of blood would probably flow from the body of a well developed and plethoric girl of thirty years of age, who had been killed suddenly by numerous incised and lacerated wounds.   The purpose was not to permit the witness, as an

[O'Mara *v.* Commonwealth.]

expert, to give an opinion upon a hypothetical case based upon the supposed truth of his previous statement; but it was to state a fact known to him as an expert, which bore upon other facts proved. On the morning of the 27th of September 1873, the body of Mary O'Mara, the deceased, was found beside the railroad, near to the Montrose depot, several miles away from her home. No blood was found near the body or on the iron rails. But at her home, where she was known to be on the night before, much blood was found, and it was traced along the road toward the depot. The quantity of blood likely to flow from the body of a girl such as described in the offer, therefore, had some bearing upon the place where the death actually happened; and whether it was likely it occurred near the depot, and by being run over by a train of cars.

The seventh assignment alleges error in admitting the testimony of Thomas Killea, of what Daniel O'Mara's wife said to him at the Montrose depot, to wit: "I saw Dan O'Mara's wife when she came; she said to Daniel if she had been at home this would not have happened; Dan made no reply to this." It is objected that the wife's declarations ought not to be heard against her husband; and also that the declaration to him and his want of reply, tends to an unfavorable inference against him. But it was not an *ex parte* declaration of the wife. It was a statement to O'Mara himself, which being made to him, whether by his wife or another, is to be judged of by his own conduct and not by her declaration only. It was a fact or occurrence to which he himself was a party, and the declaration was a part of the *res gestæ*, which is evidence only because he himself was a partaker in it. If in fact his wife had been at home, it is but reasonable to think he would have said so in reply.

The tenth, eleventh and twelfth errors were not properly assigned, but *in favorem vitæ* we have permitted amendment. The tenth and eleventh raise the question whether a presumption in law of murder arises from an unlawful homicide, or whether it is one solely of fact to be determined by a jury. The answer of the court to the first point was that if the jury found an unlawful killing, it is presumed to be murder of some degree, unless the contrary appears in the evidence; though this presumption rises no higher than of murder in the second degree, until it is shown by the Commonwealth to be murder in the first degree. The second point called upon the court expressly to charge that the presumption was one of fact only. This the court declined. In these rulings the court followed Commonwealth *v.* Drum, 8 P. F. Smith 18, stating the common law of the crime of murder.

The crime of murder was not altered by the Act of 22d of April 1794, since incorporated into the amended criminal code. In White *v.* The Commonwealth, 6 Binney 179, C. J. Tilghman said, "Now this act does not define the crime of murder, but refers

[O'Mara *v.* Commonwealth.]

to it as a known offence; nor, so far as concerns murder in the first degree, does it alter the punishment, which always was death. All that it does is to define the different kinds of murder which shall be ranked in different classes, and be subject to different punishments." Justice Blackstone in his Commentaries, vol. 4, p. 201, says, we may take it for a general rule that all homicide is malicious and of course amounts to murder, unless when justified, excused or alleviated. All these circumstances of justification, excuse or alleviation, he continues, it is incumbent upon the prisoner to make out to the satisfaction of the court and jury; the latter of whom are to decide whether the circumstances alleged are proved to have actually existed; the former, how far they extend to take away or mitigate guilt. For all homicide, he says, citing Foster 255, is presumed to be malicious, until the contrary appeareth upon evidence. The same rule is stated by Judge Addison in three cases: Honeyman's, McFall's, and Lewis's, Add. Rep. 147, 257, 282. Primâ facie, he says, every killing is murder, for malice is presumed, unless the prisoner show extenuating circumstances which take away the presumption of malice. This then is a common-law presumption, but when the legislature classified murders, arranging them in two degrees, the burthen fell upon the Commonmonwealth to show that the homicide is murder in the first degree; the common-law presumption rising no higher than the second degree.

Under the twelfth assignment of error, exception is taken to the constitution of the Court of Oyer and Terminer. It is contended, when the new Constitution took effect, that the associate judges not learned in the law dropped out of this court. If this be true, not only have many causes been tried before illegally-constituted Courts of Oyer and Terminer, but the fatal error pervades the Courts of Quarter Sessions, Orphans' Courts, and General Jail Delivery. The question is serious and perplexing, bringing to light a palpable want of harmony in the parts of the new Constitution. That the office of associate judge not learned in the law, is continued in counties connected with others in forming judicial districts, and abolished only in the separate districts, is evident: vide section 5th, article 5th, and section 16th of the Schedule. But what *places* these associates *now* fill is a different and difficult question. If we *must* follow the ordinary rules of interpretation, when a subsequent statute alters a former act, we are necessarily led to the conclusion that the convention meant in section 9th, of the fifth article of the new Constitution, to exclude all associates unlearned in the law, from all the courts but the Common Pleas. That section is a substitute in part for the 5th section of the 5th article of the Constitution of 1790 and 1838, which reads as follows: "The judges of the Court of Common Pleas in each county, shall, by virtue of their offices, be justices of Oyer and Terminer and General Jail Deliv-

[O'Mara v. Commonwealth.]

ery, for the trial of capital and other offenders therein. Any two of the said judges, the president being one, shall be a quorum ; but they shall not hold a court of Oyer and Terminer or Jail Delivery in any county, when the judges of the Supreme Court, or any of them, shall be sitting in the same county." The remainder of the section relates to another subject. The 9th section of the 5th article of the new Constitution reads thus : " Judges of the Courts of Common Pleas, *learned in the law*, shall be judges of the Courts of Oyer and Terminer, Quarter Sessions of the Peace, and General Jail Delivery, and of the Orphans' Court, and within their respective districts, shall be justices of the peace as to criminal matters." This section is in part a substitute also for the 7th section of the 5th article of the former Constitution, to which, however, no reference is now necessary. In combining the two sections just recited, we discover two important changes : an interpolation into the 9th section of the 5th article of the new Constitution, of the words " *learned in the law ;*" and the omission of the clause " *Any two of the said judges, the president being one, shall be a quorum.*" This interpolation and this omission are so clearly indicative of intentional change, they compel us to conclude that the convention meant to alter the constitution of the several courts named in the 9th section. But was it their intention to carry this alteration into all the judicial districts of the state ? Here there is room for argument. That the convention made a difference in the districts, is on the face of the instrument, in some, the judges being those learned in the law only, and in others, the judges unlearned in the law being continued. Vide article 5th, section 5, of the Constitution and section 16th of the Schedule. The language of the 9th section is simply affirmative, without words of exclusion. We therefore must gather the true sense of the convention from various considerations, among them evident defectiveness in the execution of their work.

The distribution of the work into the hands of so many committees upon different and independent topics, leading to want of harmony in arrangement; and the segregation of the provisions of certain leading sections of the old Constitution, to carry them into new and distant relations, whereby some were lost sight of, probably were the causes of incongruity and of omissions ; as in taking down an old structure to rebuild it upon a new and larger scale, some of the parts were laid aside and unintentionally forgotten. Such omissions were found in distributing the clauses of the judicial amendment of 1850. For example, the clause providing for commissioning all the judges, and that also relating to the beginning of the terms of the supreme judges. These remarks are simply to show that the absence of a provision, as to what courts the associate judges unlearned in the law should fill in the districts in which the

25 P. F. Smith—28 .

[O'Mara *v.* Commonwealth.]

office is continued, was an unintentional omission, arising probably from the habit of considering them as judges of all the courts.

Let us now view the effects and consequences of a literal interpretation of the 9th section, excluding the associates unlearned in the law from all the courts therein named. One is to confine the services of these judges to the Courts of Common Pleas, where they are needed less. Another is to dispense with their services in those courts where they are needed more. The greatest use for the associates is found in their local knowledge, and presence in the counties where the president is not a resident, enabling them to attend to matters of bail, security, appointments of viewers, appraisers, guardians, committees and other matters required to be done in the Quarter Sessions and Orphans' Courts. When the president judge resides in the district, as all judges learned in the law must, who have separate districts, consisting of single counties, the necessity for associates unlearned in the law does not exist. But the necessity for these associates remains in all districts composed of two or more counties, and in them the office is continued. In continuing the office, it cannot be supposed the convention intended to lessen its utility, that being the only reason for continuing the office itself. It would rather seem that the 9th section were framed in view of the provision for judges learned in the law, including the provision for additional judges by the legislature, in all the separate districts and the great cities of the Commonwealth, while the places to be filled by the associates unlearned in the law were overlooked, upon the supposition that they would continue as theretofore, in all the counties where the office itself continued. It would be to impute folly to the convention to continue the office, and yet cut it off from its greatest usefulness. In this connection the absence of words of exclusion is important. The phraseology of the 9th section is peculiar, and affirmative merely. "Judges of the Court of Common Pleas learned in the law, shall be judges of the Courts of Oyer and Terminer," &c. The definite article is wanting, making the sentence simply a general affirmative, and "judges" is not coupled with any expression implying exclusiveness.

Another circumstance having a bearing, though a minor one, is the omission to make any change in the commissions of the associate judges not learned in the law. If the convention had intended to exclude these associates from all the courts except the Common Pleas, it seems natural that intention would have found a place somewhere, either in prescribing for their commissions, or in the sections relating to their office. But it is said without qualification in the 5th section of the 5th article, that the several associates in office shall *serve* for their unexpired terms; and in the 16th section of the schedule, that associate judges not learned in the law elected after the adoption of this constitution, shall be

[O'Mara *v.* Commonwealth.]

*commissioned to hold their offices* for the term of five years, from the first day of January next after their election. It may be remarked in passing that this clause is misplaced, its true place belonging to the 5th article. Its position in the schedule leads to the impression that it was an after-thought. Thus the absence of words of exclusion, and the merely affirmative phraseology of the 9th section, the perpetuation of the office in districts consisting of more than one county, from one or more of which the judge learned in the law is absent, and the necessity for the services of the associates in those counties, taken into connection with manifest omissions in other respects, unite in leading us to believe that the omission of any clause as to the courts to be filled by the associates, is a mere oversight, and that the convention did not intend to exclude them from the several courts in those districts where their offices are continued.

In The Farmers' and Mechanics' Bank *v.* Smith, 3 S. & R. 69, Chief Justice Tilghman laid down the rule that conventions intended to regulate the conduct of nations, are not to be construed as articles of agreement at common law. But where multitudes are affected by the construction of an instrument, great regard should be paid to *spirit* and *intention ;* a rule approved, expanded and applied to the Constitution itself, by Chief Justice Gibson in Monongahela Nav. Co. *v.* Coons, 6 W. & S. 114. Following this rule, and *ut res magis valeat quam pereat,* we have reached the conclusion that the 9th section of the 5th article of the new Constitution, was not intended to exclude the associate judges unlearned in the law, from the several courts named in that section, in those districts where these associates remain. Any other interpretation would be disastrous.

The other assignments of error need no special notice. Finding no error in the record, the judgment and sentence of the court below are affirmed, and it is ordered that the record be remitted for execution.