UNITED STATES of America,
Plaintiff-Appellee,

v.

David SCHRIMSHER, Defendant-
Appellant.

No. 73-2627.

United States Court of Appeals,
Fifth Circuit.

May 3, 1974.

See also, 5th Cir., 493 F.2d 842.

849

Charles D. Butts, San Antonio, Tex., for defendant-appellant.

William Sessions, U. S. Atty., Wayne E. Speck, Asst. U. S. Atty., James W. Kerr, Jr., San Antonio, Tex., for plaintiff-appellee.

Before RIVES, GEWIN and RONEY, Circuit Judges.

RIVES, Circuit Judge:

After a jury trial, David Schrimsher was convicted on a one-count indictment which charged him with wire tapping in

violation of 18 U.S.C. § 2511(1)(a).[1] Schrimsher was sentenced to a three-year indeterminate sentence under 18 U.S.C. § 4208(a)(2), and he appeals. We affirm.

## I.

At about one o'clock on the afternoon of July 16, 1972, Jane Roberts noticed that a small door leading to the crawl space under her house was ajar. When she attempted to put the door back in place, the door fell to the ground, and Roberts found herself face-to-face with the appellant Schrimsher. Understandably startled, Roberts screamed, and then ran into her house, where she telephoned for help. Schrimsher fled the premises. Upon investigation, the authorities found a large number of items under the house—including a cassette tape which contained telephone conversations between Roberts and others, a cassette tape recorder, a telephone jack, a microphone jack, a male extension plug that was cut into the electrical system of the house, an extension cord, a tool box, newspapers, a camping mattress, a thermos, an ice bucket, cantaloupe rinds, and other items.

Schrimsher took the stand in his own defense. He testified that he and Roberts had been lovers, and that she had led him to believe that he had fathered one of her children. He stated that in early 1972 Roberts told him to leave her alone and threatened to turn him over to her grandfather, who she said had underworld connections. Schrimsher explained that he became worried about his own safety and the well-being of the children, and thereupon embarked upon a course of investigation to ascertain where he stood with her and to determine whether she had told the truth about her grandfather.

Schrimsher's course of investigation apparently included wire tapping. Un-

der cross-examination, he admitted the following conduct:

"Q. [Mr. Speck, Assistant U.S. Attorney]: You put all that stuff [equipment] under Janie Roberts' house?

"A. [Mr. Schrimsher]: Yes, I did.

"Q. Your purpose was to listen to the telephone calls and record them, right?

"A. Yes, it was.

"Q. And that is what you did?

"A. Yes, I did.

"Q. Was that your only purpose?

"A. Yes, it was.

"Q. When did you go under there first?

"A. I believe it was Monday, the 11th of July.

"Q. You are sure you weren't under there before that?

"A. No.

"Q. Pardon me?

"A. I was not under there before that.

"Q. Okay. You were under there until the 16th.

"A. Yes.

"Q. You recorded all the telephone calls that came in and out of there.

"A. Most of them, yes. [Tr. 305–306.]

## II.

In a recent civil case, Simpson v. Simpson, 5 Cir. 1974, 490 F.2d 803, this Court held that the wire interception provisions of the Omnibus Crime Control and Safe Streets Act of 1968 did not apply to an interception by a husband of the conversations of his wife with a third party over the telephone in the marital home. The Court in *Simp-*

---

1. "Except as otherwise specifically provided in this chapter any person who—

"(a) willfully intercepts, endeavors to intercept, or procures any other person to in-

tercept or endeavor to intercept, any wire or oral communication;

\*    \*    \*    \*    \*

shall be fined not more than $10,000 or imprisoned not more than five years, or both."

*son* relied in part upon a provision in the Act which indicated that Congress intended to adjure from deciding the extent of privacy family members could expect within the home vis-a-vis each other. The Court expressed doubts about even this limited exclusionary construction of the statute, however, and emphasized that "No public official is involved, nor is any private person other than appellee [the wife], and the *locus in quo* does not extend beyond the marital home of the parties." (490 F.2d at p. 810.)

Schrimsher has never been married to Roberts. At the time of the incident in question, he was not a part of the Roberts' household, and had no legal right to be on the premises or to tape record Roberts' telephone conversations. Under these circumstances, Schrimsher's conduct is within the scope of the statute.

### III.

■ Schrimsher claims that the trial judge took a prosecutorial role during the trial; that the judge cast aspersions upon, harassed and intimidated defense counsel; and that the judge by his actions and manner during the trial demonstrated bias and prejudice against the defendant and his attorney. Schrimsher cites incidents which occurred before, during and after the trial in support of his position that the trial judge lacked the impartiality necessary to give the defendant a fair trial.

Schrimsher complains that the trial judge improperly tried to force Butts, counsel for the defendant, to reveal the details of a proposed defense witness' testimony. During the discussion of a motion to quash a subpoena issued for Albino Alonzo, a male friend of prosecution witness Roberts, the judge asked Butts what he intended to show by Alonzo's testimony. At first, Butts refused to answer because Roberts, who was un-

der the Rule,[2] was in the courtroom. The judge apparently expected Butts to put Alonzo on the stand in the absence of the jury to show the relevance of Alonzo's proposed testimony, and therefore saw no reason to exclude Roberts until Alonzo actually took the stand. Butts in fact intended simply to relate to the court what Alonzo was expected to testify. He consequently wanted Roberts excluded before he made his explanation. After some discussion, the judge agreed to exclude Roberts from the courtroom. Then, when the judge pressed Butts to tell what he proposed to prove through Alonzo, Butts replied, "I respectfully decline to try my case until the Government has rested its case." The court asked only one further "yes" or "no" question, and Butts answered without objection. The court subsequently allowed Butts to call Alonzo and to question him at some length. On these facts, Schrimsher has no legitimate cause for complaint. The judge excluded Roberts after Butts made clear his objection, and overruled the government's motion to quash Alonzo's subpoena.

Schrimsher points to several incidents which occurred during Butts' cross-examination of Roberts as evidence of the judge's bias. At one point in the cross-examination, Butts asked Roberts if she recognized a photograph. The judge asked Butts to mark the photograph as an exhibit. When Butts resisted[3] the judge apparently lost his temper, and in the presence of the jury told Butts to "Shut up." The jury was then excused for the noon recess, and the judge and Butts immediately became embroiled in argument. The dispute ended when the judge found Butts in contempt and asked the marshal to take him to jail until the beginning of the afternoon session. In the case of United States v.

---

2. The rule of exclusion whereby a witness is excluded from the courtroom while other witnesses are testifying.

3. Butts, in his brief on this appeal, states that he tried to explain to the trial court that he wished to introduce a copy of the photograph, rather than the original, so that Schrimsher could keep the original, which had sentimental value to him.

Schrimsher; In re: Charles D. Butts, Attorney at Law, Appellant, No. 73–1061, 493 F.2d 842 decided contemporaneously with this appeal, we reverse Butts' conviction for contempt because of the trial court's failure to comply with the technical requirements of Rule 42, F.R.Cr.P. It would be fair to say that the judge displayed impatience with Butts on this occasion.

When the afternoon session began, Butts resumed his cross-examination of Roberts. Schrimsher claims that at this time the judge questioned Butts' good faith and integrity during a bench conference. Butts was examining Roberts about letters she had apparently sent to Schrimsher when the government requested an opportunity to make an objection at the bench. The government suggested that it was unfair not to show the witness the letters under consideration. The court commented, "All right, I assume he [Butts] has the letters or he wouldn't ask the questions." [Tr. 133.] As the conference concluded, the judge stated, "I am letting you [Butts] have the full right of cross-examination, so continue, but just remember that I expect every one of those questions to be backed up with a legitimate handwriting exemplar." [Tr. 134.] [4] Nothing in this incident suggests that the judge was questioning Butts' integrity. The judge assumed that Butts was acting in good faith, and overruled the government's objection on this assumption. The statement that there should be evidence to back up the questions was purely cautionary, and probably resulted from the government's repeated statements of concern that no authentic letters existed.

On the same afternoon, while Butts was questioning Roberts, the court stated: "We've got to move this case, it is already 2:30. I want to finish it by tomorrow evening." [Tr. 135.] Schrimsher complains that this constituted harassment. It is true that the comment was probably intended for Butts. However, the suggestion was never repeated, and there is nothing in the record to indicate that the judge took any other measure to speed the case, or that Butts shortened his examination of the witnesses.

■■ Schrimsher also suggests that actions taken by the judge both before and after the trial demonstrate the judge's bias. At a conference in chambers before the trial, Butts tried to convince the judge to reduce the charge to a misdemeanor. The judge refused. The government on appeal admits that government counsel would have preferred to "carve out" a misdemeanor, but states that the government was unable to find a misdemeanor to which the matter could be reduced. Certainly the judge committed no error in going forward under the grand jury indictment, and his decision to do so may not be used as evidence of bias. After the trial, the government moved that bond be revoked and that the defendant be remanded to the custody of the marshal without bond. A hearing was held. The government introduced evidence of an anonymous telephone call to Roberts' mother. Also, Roberts testified about an incident earlier in the year where Schrimsher had threatened her and the children. The trial court found that Schrimsher constituted a danger to Roberts and her children, and set bond at $100,000.00. Without passing on the propriety of the amount of the bond, we conclude that the district court's action in this regard does not necessarily show bias, and does not reflect upon the fairness of the trial.

■ Schrimsher further claims that the judge's bias is demonstrated by the severity of the sentence imposed in this case. On December 22, 1972, the trial judge "committed [Schrimsher] to the custody of the Attorney General for the maximum period, that is, five (5) years imprisonment and $10,000.00 in fine, for study and evaluation pursuant to 18 U.

---

4. Later, the court allowed numerous letters into evidence, although Roberts claimed not to recognize the handwriting and the contents of some of them.

S.C. § 4208(c)." (R. 40.) The judge requested this study because of what he considered "bizarre conduct" on the part of the defendant. On April 16, 1973, the judge set aside his original sentence and sentenced Schrimsher under the Youth Corrections Act (18 U.S.C. § 5010(b)). Upon discovery that Schrimsher was too old at the time of conviction for sentencing under this Act, and after considering the government report on Schrimsher, the judge imposed sentence of four years' imprisonment under 18 U.S.C. § 4082(a) and vacated the $10,000.00 fine. The judge recommended commitment to a Federal Correctional Institution where Schrimsher could receive psychotherapy. Further motions by the defendant led the judge to order a psychiatric examination of Schrimsher by the Chairman of the Department of Psychiatry at the University of Texas Medical School. Examination by a psychiatrist selected by the defendant was also permitted. After considering the reports of both psychiatrists, and other evidence, the judge found that Schrimsher was not suffering from a psychosis or other mental disease or defect, and again modified the sentence, "so that the same should be a maximum sentence of three (3) years imprisonment in the custody of the Attorney General of the United States under the terms of 18 U.S.C. § 4208(a)(2) so that the defendant David Schrimsher may become eligible for parole at such time as the Parole Board may determine." (R. 67.) We have de-

scribed the post-conviction proceedings relating to sentencing in some detail because they suggest that the trial judge made every effort to determine a fair sentence. The final sentence was not harsh.

Taking into consideration the incidents cited by Schrimsher and having examined the trial transcript, we are not convinced that the trial judge demonstrated such bias against the defendant and his attorney that the defendant did not receive a fair trial. To the contrary, the transcript demonstrates that the judge was scrupulous in his efforts to conduct a fair trial. He gave Schrimsher every opportunity to challenge the prosecution's witnesses, and to present his own case. We do have some reservations about the dispute which led the court to hold Butts in contempt. However, we find no evidence that the events which took place during this particular incident carried over into the rest of the trial.

## IV.

On the morning after Butts' incarceration for contempt the *San Antonio Express* carried a 2½ x 6″ photograph of Butts and a column entitled, "S.A. Lawyer Jailed Briefly for Contempt." [5] Upon being informed of this article and of the possibility of a television or radio report, the trial court questioned the jurors. Without revealing the contents of the column, the court discovered that five of the jurors had seen the article.

---

5. The article read as follows:

"San Antonio lawyer Charles D. Butts spent his lunch hour Thursday in the U. S. marshal's lockup on the third floor of the federal building.

"He was taken to the cell after being found in contempt of court by U. S. Dist. Judge D. W. Suttle during trial of a wiretapping case.

" 'I took exception to the judge telling me to shut up in front of the jury,' Butts said as a deputy marshal escorted him from the courtroom about 11:30 a. m.

"In his written order, Judge Suttle cited Butts for 'such contempt (of the court's authority) . . . as to amount to misbe-

havior . . . or so near thereto as to obstruct the administration of justice.'

"Suttle's order said the contempt was 'an accumulation of remarks of counsel made during the absence of the jury and is confined to such acts of contempt as were committed . . . in the absence of the jury.'

"Butts was released from custody after two hours when the trial resumed.

"The prosecution rested its case against Butts' client, David Schrimsher, during the afternoon session.

"Schrimsher, 26, of 2300 Nacogdoches Rd., is accused of installing an illegal wiretap and intercepting telephone calls at a private North San Antonio residence."
Defendant's Exhibit "A" (New Trial).

The court then asked each of those five jurors in open court whether the article would affect him in considering the issues in the case. Each answered that he could disregard the article. The court further discovered that three jurors had overheard Butts' remark in the elevator that he was going to jail. These jurors stated that they could still give Schrimsher a fair and impartial trial. On this basis, the court found the jury "qualified to serve," and overruled Schrimsher's motion for a mistrial. (Tr. 248.) During the questioning, the judge cautioned the jurors that nothing which occurred between the judge and an attorney should affect their consideration of the facts in the case.

■■ Schrimsher claims that the jurors who learned that Butts had been jailed were irretrievably prejudiced by this knowledge. Every claim of jury prejudice because of a newspaper article's appearing during a trial must turn on its own facts. Marshall v. United States, 1959, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250. Some information is so prejudicial that curative instructions and assurances from the jurors would not be adequate to eliminate the harm done by a newspaper article. In this case, however, the article concentrated on the dispute between the judge and Butts, and the jailing of Butts. There was little reference to Schrimsher, and what reference there was in no way reflected upon his guilt or innocence on the wiretapping charge. We conclude that seeing this article would not inevitably and irrevocably prejudice a juror.

■ Schrimsher also claims that the court should not have questioned the jury *en masse*. The judge in this case questioned each juror separately, but in the presence of the other jurors. The safer practice in situations involving possible prejudice from newspaper articles or other sources is to interrogate each juror separately and out of the presence of the other jurors.[6] However, the procedure used here was not prejudicial error under the particular circumstances of this case. The article did not relate directly to Schrimsher, and was not suggestive in any way upon the question of his guilt or innocence. Also, Schrimsher did not object at the time to the procedure followed by the trial court.

## V.

■ Schrimsher claims that his right to effective counsel was violated when the court incarcerated Butts for approximately two hours for contempt, and then forced Butts to proceed immediately with the trial after his release from confinement. Possibly Butts would have conferred with his client or with his witnesses for all or part of the lunch break. For this reason, a short delay might have been granted before resuming the trial. Refusal to grant a delay was not prejudicial error in this case, however. When the government rested its case late in the afternoon, the court granted a recess to allow Butts to determine whether two of his witnesses had arrived, and to speak briefly with the two witnesses. Both witnesses had arrived and both testified. More significantly, the case extended into the following day. Butts therefore had overnight to consult with his client and any other potential witnesses. Schrimsher does not allege any particular prejudice arising out of the deprivation of his attorney for the two-hour period.

## VI.

During cross-examination, Schrimsher admitted that he had, on May 8, 1972, taken photographs of Roberts and a man visiting in her house. The following exchange then occurred:

"Q. [Mr. Speck] May we see them [the photographs]?

"A. [Mr. Schrimsher] Yes.

6. Hall v. United States, 10 Cir. 1968, 396 F. 2d 428; Mares v. United States, 10 Cir. 1967, 383 F.2d 805, 809; Coppedge v. United States, 1959, 106 U.S.App.D.C. 275, 272 F.2d 504.

"MR. SPECK: Your Honor, may I ask for a recess in order for the defendant to bring the photographs, and secondly, we would ask, may we see the rest of the tapes and the tape recorder?

"Q. Would you bring those to us, sir?

"A. Yes, I have the tapes.

"Q. May we see them?

"A. I don't have them here.

"Q. Where are they?

"A. I will have to get them.

"Q. Where are they?

"A. In my apartment.

"Q. Are the photographs there, too?

"A. Yes.

"MR. SPECK: The Government would respectfully request a recess for that purpose.

"THE COURT: What about the—I don't know what you call it, the box that the reels were on?

"MR. SPECK: The tape recorder, too.

"THE COURT: The tape recorder. Did you leave the house on July 16th with a recorder?

"THE WITNESS: Yes, sir.

"THE COURT: Do you have that recorder, also?

"THE WITNESS: Yes, sir." (Tr. 311–312.)

The court then granted a recess, and retired the jury. Schrimsher's attorney at this point objected to the defendant's being required to bring to court any items not connected with the events of July 11 through July 16, on the grounds that such items would tend to incriminate Schrimsher in violation of his rights under the Fifth Amendment, and would not be relevant to the offense charged. Schrimsher did not object to bringing the tape recorder or any other items within the time frame of the indictment. The court overruled the objection.

The tape recordings brought from Schrimsher's apartment and admitted in evidence contained conversations recorded between July 11 and July 16. By testifying about the events of July 11 through July 16, Schrimsher had waived his Fifth Amendment testimonial privilege as to these items. Rogers v. United States, 1951, 340 U.S. 367, 71 S. Ct. 438, 95 L.Ed. 344. The two photographs present a somewhat more difficult issue. Schrimsher testified at greath length about the details of his relationship with Roberts. The photographs in question were taken by Schrimsher, and relate to his relationship with Roberts. Under these circumstances, it was not prejudicial error to require Schrimsher to produce them in court after he had acknowledged that he had copies of the photographs at his apartment.

Affirmed.