**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George Keith WILLIAMS,**
**Defendant-Appellant.**

No. 77–5200.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1978.

Wayne S. Hyatt, Atlanta, Ga. (Court-appointed), for defendant-appellant.

Wm. L. Harper, U. S. Atty., Atlanta, Ga., C. Brian McDonald, Atty., Drew S. Days, III, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

In February 1975, a 56-year-old illiterate maintenance worker was allegedly beaten by three deputy sheriffs and one policeman. Appellant Williams, then a deputy, and three other defendants were indicted by a federal grand jury in the Northern District of Georgia for violating the man's civil rights in contravention of 18 U.S.C. § 242. All four were convicted in a jury trial in May 1976, but the district court granted defendants' motion for a new trial. A second jury trial was held in early February 1977, and the four defendants were again convicted. Only Williams appeals.

Three issues are presented to this court: (1) whether exposure of jurors, during the second trial, to news reports containing references to defendants' conviction in the first trial deprived appellant of a fair trial; (2) whether appellant waived his right to a 12-member jury; and (3) whether appellant was denied effective assistance of counsel because his attorney also represented the other defendants. For the reasons stated below, we reverse and remand for another trial.

On the third day of the second trial, the government pointed out to the court that a local television news broadcast on the previous evening had included a story about the

**466**

trial. The trial judge had seen the report, which was a "straight" news story [1] about the opening of the second trial. At the very end of the story was the statement that the four defendants had been convicted in a previous trial, but that a new trial had been granted because of "erroneous testimony." [2]

At the trial's outset, the jury had been instructed not to read, view, or listen to anything about the trial. When the court polled each juror individually [3] after learning of the newscast, however, five jurors admitted knowing of the report, but only two—Jurors Richardson and Chase—had actually seen it. [4] Their testimony was equivocal and somewhat inconsistent as to what they had learned from the news story, but it seems clear that they heard of the prior trial and its result. [5] In response to an inquiry from the court, both stated that the story would in no way influence their decision in the case.

Defense counsel moved for a mistrial, but the motion was denied. Subsequently, the court gave the jury the usual instruction to disregard everything not heard in court. No specific instruction was given the two jurors to disregard the news report of the prior trial, nor were they instructed that the prior instructions were not evidence of guilt. However, the record contains no requests for such instructions. After the guilty verdict, defense counsel moved for

---

1. In news media parlance, a "straight" news story is one devoid of editorializing or commentary. It simply recounts the news event in straightforward terms without embellishment or interpretation by the reporter. This particular story also contained background information.

2. The full report said:

   Four former law officers went on trial a second time today in federal court in Atlanta. Three former Newton County deputy sheriffs and a former Covington policeman are charged with depriving a man of his civil rights. They are accused of beating the man, who is from Covington.
   57-year old Howard Brooking says he suffers from diabetes, heart trouble, back problems, and nervousness. He hasn't worked since February of 1975. That's when four officers of the law allegedly brutalized him.
   The motive—reportedly because Brooking talked about them drinking on duty and for ratting to one of their wives about her husband having a girlfriend.
   The case is being prosecuted by the Civil Rights Division of the Justice Department. Accused are former Covington policeman Jack Hodges [and] former Newton County sheriff's deputies Clarence Allen, George Williams, and Otis Lott.
   According to Brooking, Lott was the one that beat him the most. Lott was an unsuccessful candidate for Newton County Sheriff last year. The defendants are pleading not guilty and claim Brooking is a heavy drinker who is looking for financial gain. Brooking has filed a $1 million damage suit against the defendants.
   The four were convicted in the first trial last May. But the Judge, Charles Moye, overturned the verdict because of erroneous testimony about the lawsuit. This second trial is expected to last through next week before going to the jury.

3. This, of course, is the safer practice. *See United States v. Schrimsher*, 493 F.2d 848, 854 (5 Cir. 1974); *compare United States v. Rhodes*, 556 F.2d 599 (1 Cir. 1977). Here the district judge conducted the bulk of the voir dire because defense counsel had not seen the newscast and no transcript was then available. The judge had seen the report.

4. Of the three who had not viewed the newscast, one learned about it from his daughter and the other two were told by other jurors. These three apparently knew no details of the story.

5. Ms. Richardson testified that she had "listened good" when she "found out it was our case." (R.274). She admitted having heard a portion of the story stating that the trial was likely to continue into the next week, which was the last sentence of the report (R.275), and the court concluded that she must have heard the remark about the first trial (R.276).
   Ms. Chase, originally the alternate in the case, was pressed into service due to the absence of a regular juror. Her answers to the judge's questioning were contradictory. She first stated that she had turned off the television as soon as she realized that the story was about the trial (R.280). However, she later indicated that she heard the statement that the trial would probably continue until the following week (R.281). When the judge asked whether she had heard anything concerning "other proceedings through which this case has traveled," she responded that she "had already heard in court that there had been a new trial." (R.281). Pressed further by the judge, she admitted that she had learned of the prior trial from the newscast (R.282).

judgment n. o. v. and for a new trial, but the motion was denied.

The problem of prejudicial publicity is hardly unique to the age of modern journalism and media technology. In the mid-eighteenth century, Lord Chancellor Hardwicke utilized the contempt power when remarks threatened to prejudice a pending case. *Roach v. Garvan*, 26 Eng.Rep. 683 (Ch.1742). And just over a hundred years later, this observation was made of American society:

> Ours is the greatest newspaper reading population in the world; not a man among us fit to serve as a juror, who does not read the newspapers. * * * In the case of a particularly audacious crime that has been widely discussed it is utterly impossible that any man of common intelligence, and not wholly secluded from society, should be found, who had not formed an opinion.

*Trial by Jury in New York*, 9 L.Rep. 193, 198 (1846), quoted in *ABA Standards Relating to Fair Trial and Free Press* 21 (1968). Mark Twain addressed the issue in his book *Roughing It* (1872), recounting in his inimitable style "one of those sorrowful farces, in Virginia, which we call a jury trial." After describing how many upstanding citizens were disqualified on voir dire because they had read newspaper accounts of the murder, Twain wrote:

When the peremptory challenges were all exhausted, a jury of twelve men was impaneled—a jury who swore they had neither heard, read, talked about, nor expressed an opinion concerning [the] murder. . . . It was a jury composed of two desperadoes, two low beer-house politicians, three barkeepers, two ranchmen who could not read, and three dull, stupid, human donkeys. . . .
The verdict rendered by this jury was, Not Guilty. What else could one expect?

Remarkably similar sentiments were expressed two years later by the Pennsylvania Supreme Court, which feared that newspaper publicity might result in important cases being decided by jurors whose "dark minds have never been smitten by the rays of intelligence." *O'Mara v. Commonwealth*, 75 Pa. 424, 428 (1874).

Compounding the problem has been the news media's penchant for extensively covering sensational trials. Perhaps the classic example is the 1935 trial of Bruno Richard Hauptmann, who was convicted for the kidnapping and murder of the 19-month-old son of aviator Charles Lindbergh. The defendant was once described in the press as a "thing lacking in human characteristics," and some 700 reporters—including such renowned journalists as Walter Winchell—flocked to the trial.[6] Similar coverage occurred at earlier trials involving persons who had caught the fancy of the press and public,[7] perhaps prompting H. L. Mencken's

---

**6.** *See New Jersey v. Hauptmann*, 115 N.J.L. 412, 180 A. 809, *cert. denied*, 296 U.S. 649, 56 S.Ct. 310, 80 L.Ed. 461 (1935); J. Lofton, Justice and the Press (1966). An American Bar Association committee called Hauptmann's trial "the most spectacular and depressing example of improper publicity and professional misconduct ever presented to the people of the United States in a criminal trial." *Report of the Special Committee on Cooperation Between Press, Radio, and Bar*, Vol. 62, at 861 (1937).

**7.** The 1907 trial of Harry Thaw for the murder of architect Stanford White attracted extensive coverage, primarily because White had seduced Thaw's wife, Evelyn Nesbit, a noted glamour girl of the era. Thaw shot Stanford to death in Madison Square Garden, a building Stanford had designed. Twenty years later, the trial of Mrs. Ruth Snyder and Henry Judd Gray for the

murder of Mrs. Snyder's husband enjoyed similar notoriety, but for a different reason. Although it too featured a romantic triangle, the participants were not socialites and playboys but merely "the people next door." Damon Runyon described the commonplace killing as the "dumbbell murder" because, he wrote, "it was so dumb." Both Mrs. Snyder and Gray were convicted and sentenced to death in the electric chair, and one more sensation emerged from the execution. A writer for the New York Daily News surreptitiously snapped a photograph of Mrs. Snyder, strapped in the electric chair, at the instant of death. The paper ran *the picture across its entire front page.* Other notable examples of court reporting include the Sacco and Vanzetti murder trial and their eventual execution and H. L. Mencken's account of the infamous "monkey trial." Excerpts from these reports are collected in an anthology with a most significant title: Snyder & Morris, A

remark that newspapers have "debauched the courts, and connived at crime, and made justice in America a joke." [8]

Such press coverage has resulted in two broad classes of prejudicial publicity cases, and these categories occasionally overlap. The pretrial publicity cases have generally been the most notorious, including, for example, the My Lai massacre, *Calley v. Callaway*, 519 F.2d 184 (5 Cir. 1975), and the Watergate scandal, *United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The other type involves publicity during the trial, and studies indicate that the occasions on which potentially prejudicial material appears are considerably smaller in number during the trial than before. *ABA Standards Relating to Fair Trial and Free Press* 40 (1968); *see also* Jaffe, *Trial by Newspaper*, 40 N.Y.U.L. Rev. 504 (1965). The "overlap" has resulted in the so-called "media circus" cases in which there was both pretrial publicity and extensive coverage of the trial itself. *E. g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

Principles from the pretrial and "overlap" cases must not be haphazardly applied to cases involving only publicity that occurred during the trial. The "during trial" cases, though fewer in number, contain greater opportunities for prejudice. For example, information reported during the trial seems far more likely to remain in the mind of a juror exposed to it, and he may be more inclined to seek out this information when he is personally involved in the case. *See* Jaffe, *supra* at 522. Moreover, exposure of potential jurors to news accounts before trial need not result in an aborted proceeding, since the problem can be cured by a continuance or change of venue.[9] If the exposure occurs during the trial, however, the trial judge must squarely face the question of whether a fair trial is still possible. Consequently, a stricter standard should be employed in during-trial cases than in pretrial situations.

Although during-trial publicity is not a new problem,[10] the Supreme Court has not dealt solely with its constitutional dimensions. The *Sheppard* and *Estes* cases presented the problem combined with massive pretrial publicity and the havoc created by the press' presence in the courtroom. However, the Court has examined this particular type of publicity in the context of its "supervisory power to formulate . . . proper standards for enforcement of the criminal law in the federal courts." *Marshall v. United States*, 360 U.S. 310, 313, 79

Treasury of Great Reporting (1962). *See also* Lofton, *supra* n.6; Friendly & Goldfarb, Crime and Publicity (1967).

**8.** Baltimore Evening Sun, May 2, 1922, *reprinted in* H. Mencken, A Gang of Pecksniffs 75 (Lippman ed. 1975).

**9.** Of course, a trial judge can take certain steps to prevent during-trial publicity as well, an obvious example being sequestration of the jury. For discussion of these measures to deal with pretrial and during trial publicity, *see Sheppard v. Maxwell, supra*; *ABA Standards Relating to Fair Trial and Free Press* (1968); *Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue*, 45 F.R.D. 391 (1968). For recent examples, *see United States v. Gurney*, 558 F.2d 1202 (5 Cir. 1977); *United States v. Pomponio*, 563 F.2d 659 (4 Cir. 1977); *Central South Carolina Chapter, Society of Professional Journalists v. Martin*, 556 F.2d 706 (4 Cir. 1977).

In *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Court focused on the constitutionality of so-called "gag orders" that have frequently been used to curtail both pretrial and during-trial publicity. The implications of the case are examined thoroughly in *Symposium*, 29 Stan.L. Rev. 383 (1977). *See also Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7 Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), *noted in* 54 Texas L.Rev. 1158 (1976).

**10.** *See, e. g., United States v. Ogden*, 105 F. 371 (E.D.Pa.1900); *State v. Williams*, 96 Minn. 351, 105 N.W. 265 (1905); *McHenry v. United States*, 51 App.D.C. 119, 276 F. 761 (1921); *Griffin v. United States*, 295 F. 437 (3 Cir. 1924); *United States v. Carruthers*, 152 F.2d 512 (7 Cir. 1945); *Massicot v. United States*, 254 F.2d 58 (5 Cir. 1958); *United States v. Leviton*, 193 F.2d 848 (2 Cir. 1951), *cert. denied*, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952).

S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959). There the defendant was convicted of dispensing drugs without a prescription. During the trial, seven jurors were exposed to newspaper articles reporting that the defendant had previously been convicted of forgery, that he and his wife had been arrested for narcotics offenses, and that he had practiced medicine without a license. This information had been held inadmissible by the trial court. The seven jurors stated that they would not be influenced by the news accounts, and the judge refused to grant a mistrial. The Supreme Court reversed in a brief *per curiam* opinion, and some 16 years later stated that the principle behind *Marshall*, applicable only in the federal courts, is that "persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced." *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

Although it has been suggested that *Marshall* has been discredited by a line of Supreme Court cases dealing with the constitutional dimensions of juror bias,[11] the *Murphy* decision is a clear indication of its continuing vitality, and we follow it in this case, a federal criminal trial. It is plain that the *Marshall* rule is considerably broader than the constitutional standard and provides more protection against prejudice. For example, in *Murphy* the court explicitly rejected the defendant's argument that *Marshall* was applicable in state courts and emphasized that the principle had never been accorded constitutional sta-

tus. 421 U.S. at 798, 95 S.Ct. 2031. And in a concurring opinion, Chief Justice Burger wrote that he "would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case . . . ." *Id.* at 804, 95 S.Ct. at 2038.

■ This court, in cases involving federal trials, has not clearly distinguished between the *Marshall* rule and the constitutional standard. For example, in *Gordon v. United States*, 438 F.2d 858, 874 (5 Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971), the court stated that "where publicity prior to and during a trial is neither inherently prejudicial nor unusually extensive, the accused must assume the traditional burden and show actual jury prejudice." There are other cases to the same effect,[12] but all present fact situations radically different from *Marshall*. Moreover, we view the "inherently prejudicial" test outlined in *Gordon* as incorporating the *Marshall* principle; that is, news stories published during the trial that reveal to jurors a defendant's prior criminal record are "inherently prejudicial." *See Murphy v. Florida, supra*, 421 U.S. at 798, 95 S.Ct. 2031.

*Marshall* also teaches that "each case must turn on its special facts." 360 U.S. at 312, 79 S.Ct. at 1173. That case involved these circumstances: (1) newspaper articles indicated that the defendant had been convicted of other crimes; (2) the trial court refused to admit these other crimes into evidence; and (3) the articles reached at

11. The argument is made in *Fair Trial and Free Expression, Background Report for the Subcommittee on Constitutional Rights of the Senate Judiciary Committee* (94th Cong., 2d Sess. 1976), at 12. The argument is based primarily on language in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), a pretrial publicity case in which the Court said: "It is not required . . . that the jurors be totally ignorant of the facts" and that it is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." In *United States v. Haldeman*, 181 U.S.App.D.C. 254, 431 U.S. 933, 559 F.2d 31 (1976), *cert. denied*, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the court determined that it was inappropriate

to formulate a federal supervisory power standard in the pretrial publicity context and distinguished *Marshall* as jurors' exposure to publicity during the trial. 559 F.2d at 62–63 & n.40–41.

12. *E. g., United States v. Brown*, 493 F.2d 485 (5 Cir. 1974); *Hale v. United States*, 435 F.2d 737 (5 Cir. 1970). More recent cases, such as *Calley v. Callaway*, 519 F.2d 184 (5 Cir. 1975), and *United States v. Williams*, 523 F.2d 1203 (5 Cir. 1975), also fail to mention the *Marshall* test. However, these cases involved massive pretrial publicity, not exposure to publicity spawned by the trial itself.

least seven of the jurors, four of whom actually read one or more of them. The instant case, by way of comparison,[13] lines up this way: (1) television newscast reported that defendants had been convicted in the first trial on these charges, but that a new trial was ordered because of "erroneous testimony"; (2) the trial court determined that there should be no mention of the previous trial; and (3) five jurors knew of the broadcast, and two of them actually saw all or parts of it.

■ The question, then, is whether information about a defendant's conviction in a former trial is as damaging as information about a defendant's prior criminal acts. We conclude that it is perhaps even more damaging. In *Marshall*, the news stories stated that the defendant had committed other offenses that were similar to the crime charged. The articles referred to arrests on drug charges and a conviction for practicing medicine without a license, while the defendant was on trial for dispensing drugs without a prescription. In the instant case, the news story told the jurors that another jury had found the defendants guilty on the same, identical charges, but that a new trial had been ordered. Moreover, the newscast stated that the new trial had been granted because of "erroneous testimony," a statement which, although accurate, could easily be interpreted by a layman as meaning that "the defendants got off on a technicality."[14]

■ One of the fundamental rules of criminal law is that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under the circumstances assuring the defendant the attendant judicial safeguards. *Farese v. United States*, 428 F.2d 178 (5 Cir. 1970). This principle is a venerable one, having been written into our law as early as 1807 by Chief Justice Marshall in the trial of Aaron Burr. *United States v. Burr*, 25 Fed.Cas. Nos. 14692a, 14692g, pp. 1, 49 (C.C.D.Va.1807). As Justice Holmes eloquently stated one hundred years later:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

*Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

■ Obviously, reversal is not required in every case in which a news story containing facts inadmissible in evidence reaches the jury. The inadmissibility of the news report's contents is only one factor to be considered, and the crucial issue is the degree and pervasiveness of the prejudicial influence. *United States v. Solomon*, 422 F.2d 1110 (7 Cir.), *cert. denied, Sommer v. U. S.*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970). There the court stressed that the news story at issue did not contain "inadmissible evidence which was strongly probative of guilt." *Id.* at 1118. Using *Marshall* as a yardstick, we reach the opposite result in the instant case because the newscast contained information that was

---

**13.** Of the cases involving during-trial publicity, none is closer on its facts to the instant case than *Marshall*. Other cases have involved inadmissible evidence reaching the jury via the press, but they are distinguishable because the material was made known at a "critical time" in the trial. *United States v. Kum Seng Seo*, 300 F.2d 623 (3 Cir. 1962) (juror passed newspaper clipping around jury room); *United States v. Thomas*, 463 F.2d 1061 (7 Cir. 1972) (stories reached jurors during their deliberation); *United States v. Concepcion Cueto*, 515 F.2d 160 (1 Cir. 1975) (news stories appeared just before closing argument).

**14.** The government argues that the reference to "erroneous testimony" could only indicate to the jury that defendants were awarded a new trial because a government witness had perjured himself. Of course, to interpret the newscast for the jurors is nothing more than an exercise in speculation. Although the government's interpretation is plausible, it would require considerable inference-drawing on the part of the jurors. Our interpretation of the ambiguous phrase "erroneous testimony" is just as plausible—perhaps even more so—but yields a far more damaging result. Moreover, our holding in this case is not bottomed solely on such an interpretation, and it is clear that the jurors did learn of the previous trial and its result.

probative of guilt and highly prejudicial. Indeed, we are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged. Accordingly, we hold that the exposure of the two jurors to information regarding defendants' convictions at the first trial resulted in an unfair second trial.

The fact that the two jurors said they could disregard the newscast and decide the case solely on the evidence adduced in court is not controlling. In *Marshall*, the affected jurors gave similar assurances, yet the Supreme Court overturned the conviction. The effect of exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself, and a juror's good faith cannot counter this effect.[15] For that reason, we have recognized that such assurances from jurors may not be adequate to eliminate the harm done by a news report. *United States v. Schrimsher*, 493 F.2d 848, 854 (5 Cir. 1974).[16] We think that is the case here, *i. e.*, that the jurors' statements are insufficient to obviate the problems of fairness caused by the news report.

Nor are we convinced that the prejudice was corrected by the court's standard admonition to disregard everything not heard in court. In *Smith v. United States*, 385 F.2d 34 (5 Cir. 1967), the court assumed that any prejudice in that particular case had been remedied by such an instruction. However, the court was careful to distinguish that factual setting from one in which the news report contained information "probative of guilt." *Id.* at 39. Here we have precisely that situation, and the standard admonition was insufficient. As the court said in *Unit-*

*ed States v. Schrimsher, supra* 493 F.2d at 854, some information "is so prejudicial that curative instructions . . . would not be adequate to eliminate the harm done" by a news report.

Although our reversal of appellant Williams' conviction on prejudicial publicity grounds renders consideration of his other two points of error unnecessary, we deem it important to discuss briefly his contention that his attorney's multiple representation of four defendants with differing interests resulted in ineffective assistance of counsel.

Williams' primary argument is that his waiver of separate counsel in the first trial some nine months earlier did not constitute a valid waiver for purposes of the second trial. We have grave doubts that the district court's reliance on the initial waiver satisfies the requisites of *United States v. Garcia*, 517 F.2d 272 (5 Cir. 1975), and *United States v. Mahar*, 550 F.2d 1005 (5 Cir. 1977), which require the district court to participate actively in the waiver decision and to investigate thoroughly the circumstances of the waiver. This particular problem will not exist should the government proceed with a retrial in this matter since Williams was the only defendant to challenge his conviction and another attorney has taken over his case.

REVERSED and REMANDED.

**15.** *See generally* Broeder, *The Jury Project*, 26 S.D.Bar J. 133 (1957); Comment, 38 So.Cal.L. Rev. 672 (1965); *ABA Standards Relating to Fair Trial and Free Press* 60–66 (1968).

**16.** Moreover, "[i]t is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed by any prejudicial publicity they have been exposed to." *United States v. Hyde*, 448 F.2d 815, 848 n.38 (5 Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). And as we noted in a recent pretrial publicity case, "continual protestations of impartiality from prospective jurors are best met with a healthy skepticism from the bench." *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5 Cir. 1975).