DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on the judgment of the Lucas County Court of Common Pleas which, following a jury trial, found appellant, Deon Hines, guilty of two counts of rape, felonies of the first degree, in violation of R.C.2907.02(A)(1)(b), and two counts of gross sexual imposition, felonies of the third degree, in violation of R.C. 2907.05(A)(4). Appellant's alleged victim was his stepdaughter who, at the time of the trial, was 13 years of age. Appellant was sentenced to nine years on each count of rape, to be run concurrently to each other, and four years for each count of gross sexual imposition, to be run concurrently to each other. The sentences for rape and gross sexual imposition were ordered to be served consecutively to each other, for a total of 13 years imprisonment. For the reasons that follow, we affirm the judgment of the trial court regarding appellant's convictions, but reverse as to the imposition of consecutive sentences.
 {¶ 2} On appeal, appellant raises the following assignments of error:
 {¶ 3} "I. Hines' convictions were against the manifest weight of the evidence. The state offered evidence that lacked the necessary specificity and was inconsistent.
 {¶ 4} "II. The lower court should have granted Hines' motion pursuant to Crim.R. 29 because a rational trier of fact could not have found the essential elements of the crimes charged proven beyond a reasonable doubt.
 {¶ 5} "III. The trial court abused its discretion by not permitting appellant's counsel to question the state's medical expert regarding possible causes for the injury to the hymen other than sexual abuse by Hines.
 {¶ 6} "IV. Hines' sentence is not supported by the facts, nor is it constitutional."
 {¶ 7} Appellant's first and second assignments of error are related and, therefore, will be considered together. Appellant argues that the trial court erred in denying his Crim.R. 29 motion and that his convictions were against the manifest weight of the evidence. In particular, appellant asserts that the state failed to prove that the offense was committed within the time frame alleged in the indictment. Appellant also asserts that he should not have been convicted because the only evidence of rape and gross sexual imposition came from the victim's testimony, which appellant argues was inconsistent and uncorroborated.
 {¶ 8} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. As such, the issue to be determined with respect to a motion for acquittal is whether there was sufficient evidence to support the conviction. Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts.State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 9} "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 10} Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins at 387. The appellate court,{¶ 11} "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 12} In this case, the victim was born in September 1990. The victim testified that appellant began fondling her breast when she was approximately 6 or 7 years of age, when they lived on Erie Street. The victim further testified that appellant licked her vaginal area and put his fingers inside her, which she stated "hurt." She testified that this behavior began when she was in fourth grade and continued, "almost every night," until April 2002. She further testified that the cunnilingus and digital penetration occurred while the family lived on both Bush and Hillwood. Although the victim could not remember specific dates, she stated that she knew how it happened "because it haunts [her] at night."
 {¶ 13} When given the opportunity, the victim did not inform her social workers or guardians ad litem in 2001, 2002 or 2003, that she was the victim of sexual abuse and, in fact, denied that she was being sexually abused. The victim, however, readily disclosed incidents of physical abuse by appellant to her teacher, social workers and guardians. The victim was placed with her grandmother in May 2003, and then with Laurie E. a couple of months later. In August 2003, the victim wrote a letter to herself on a computer while visiting Laurie E.'s adult daughter, Angelina. The victim testified that the purpose of the letter was "to get all the feelings off [her] chest." In the letter, the victim wrote that Angelina had gone out to a bar and came home, a little drunk, with two friends, Pete and Fruit. The victim wrote that they "[freaked] [her] out":
 {¶ 14} "They [didn't] do anything to me but I don't know why * * * I just felt like I was going to get [raped] again just not by the same guy from my past. I really [don't] have to worry [it's] not like Deon is going to do it [again]. [It's] not like he could [touch] me again where I am at now. I hope. I was told that if I would tell anyone * * * that he touched me he would hunt me down and kill me and I [didn't] tell anyone I think OPPSSSSSS I told some one I told Kassie that he did. I have to forget the things that he did to me.
 {¶ 15} "He bet me he [raped] me when ever he pleased and I [didn't] like that all I have to do was tell [Jessica] and she would get every body that she know and have them [beat] his azz and then [throw] him into jail. I have to tell someone how I feel or all the anger will come out sooner or later I better be safe then sorry and I have to tell her I have to or I won't be able to make it [through] life with this shit stuck inside me I am going to tell my [counselor] when I go see him/her well how ever it is I have to tell them but I'm [scared] to tell. (sic)"[1]
 {¶ 16} Angelina gave the letter to Laurie E.'s. She brought the letter to the victim's attention, who "had a look of surprise on her face" when confronted with the letter. The victim testified that she did not want anybody to see what she had typed on Angelina's computer, and that if Laurie E. had not talked to her about the letter, the victim would never have told anybody about it. When questioned why she did not disclose the alleged sexual abuse to anyone, the victim testified that she was scared that appellant would kill her, as he had threatened. She also stated that she had told her mother on two occasions, but that nothing had come of it.
 {¶ 17} Julie Jones, Assistant Director of the Child Abuse Program at Mercy Children's Hospital, testified that, based on her training, knowledge and experience, most children do not report sexual abuse immediately. The reason for the delay in reporting the abuse is often a result of being threatened by the abuser; the abuser still having access to the victim, because they either live in the same home or the abuser has regular visitation; or out of a concern that no one would believe them if they told.
 {¶ 18} Randall Scott Schlievert, M.D., Director of the Child Maltreatment Program at Mercy Children's Hospital, conducted a physical examination of the victim on August 20, 2003. Dr. Schlievert observed a complete cleft or laceration to the victim's hymen, i.e., it was torn through on one side. Dr. Schlievert testified that such an injury "indicates that there was some trauma to the hymen that was penetrative type trauma." He further testified that it was "not a type of injury we see as either accidental causes, routinely, or also congenital type birth defects. This is pretty much evidence of a direct injury to the hymen." Dr. Schlievert testified that the injury was compatible and consistent with what could occur as a result of digital penetration. Dr. Schlievert, however, also testified that the injury to the hymen could have been caused by other means, besides digital penetration, such as penile penetration, but noted that the history provided by the victim did not provide any other potential cause for the injury, besides digital penetration. Given that the injury had already healed, Dr. Schlievert could not pinpoint the time of the injury, but did testify that it happened at some point before June 2003.
 {¶ 19} The indictment alleges that the incidents of rape and gross sexual imposition occurred between October 1, 2000 and September 12, 2002. Based on the victim's testimony, appellant was fondling her breasts since she was 6, 7, or 8 years old, which would have been approximately 1996 to 1998. The cunnilingus and digital penetration, however, began, according to the victim, when she was 10 years old and in fourth grade. The victim never stated what year this would have been, but, based on the victim's date of birth and evidence in the record, the victim would have been 10 years old in 2000 and been in the fourth grade in 2000 and/or 2001.[2] According to the victim, the sexual abuse continued on almost a nightly basis until April 2002. As such, we find that the victim's testimony established that the incidents of rape and gross sexual imposition occurred during the time period alleged in the indictment. Given the nature of the crimes and the tender age of the victim, we find that the lack of specific dates of abuse does not render the victim's testimony unreliable or uncredible, and does not exonerate appellant.
 {¶ 20} We agree with appellant that Dr. Schlievert's testimony does not establish conclusively when the victim's hymen was injured, that it was injured during the time period of the indictment, or by what specific means it was penetrated. Nevertheless, we find that it is the incidents of sexual abuse, not the actual physical injury to the victim's hymen, that the state must prove to establish rape. The fact that there was a physical finding in this case is merely consistent with the victim's allegations of digital penetration. Obviously, the physical findings of an injury to the victim's hymen, alone, could not have established rape by appellant. It was the victim's testimony that established the elements of rape and gross sexual imposition against appellant.
 {¶ 21} Accordingly, we find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. As such, the trial court did not abuse its discretion in denying appellant's motion for judgment of acquittal, pursuant to Crim.R. 29. Additionally, upon a through review of the record, we find that appellant's convictions were not against the manifest weight of the evidence and that the jury did not lose its way or create a manifest miscarriage of justice. Appellant's first and second assignments of error are therefore found not well-taken.
 {¶ 22} Appellant argues in his third assignment of error that the trial court abused its discretion in not allowing appellant's counsel to question Dr. Schlievert regarding what other causes could have caused the victim's cleft hymen. Specifically, because Dr. Schlievert could not state within a reasonable degree of medical certainty that the injury to the victim's hymen had occurred during the period charged in the indictment, or that the injury could only have occurred as a result of digital penetration, appellant argues that counsel should have been permitted to question Dr. Schlievert whether consensual sex or masturbation could have caused the cleft. Appellant's argument is based upon the following colloquy:
 {¶ 23} "Q. Other than [the victim's] statements to you, there's no way from your clinical observations from — from determining that it was a finger that was used to cause the cleft hymen?
 {¶ 24} "A. Well, I can't look at an injury and tell you exactly what caused it in isolation, but there were no other causes provided in a medical history or evaluation that would come close to explaining why that injury was there except for digital penetration.
 {¶ 25} "Q. So, if she had —
 {¶ 26} "[DEFENSE COUNSEL]: May we approach, Your Honor? * * *
 {¶ 27} "THE COURT: Where you going to go with this?
 {¶ 28} "[DEFENSE COUNSEL]: Well, I was going to ask him. He already said that a penis could cause this. I was going to ask whether or not if she had sex with contemporary, you know —
 {¶ 29} "[THE STATE]: You can't —
 {¶ 30} "THE COURT: You can't.
 {¶ 31} "[DEFENSE COUNSEL]: I'm not asking — I'm not bringing evidence that she in fact was involved with sexual activities.
 {¶ 32} "THE COURT: It's already in about a penis.
 {¶ 33} "[DEFENSE COUNSEL]: All right.
 {¶ 34} "THE COURT: You want to know whose penis it was?
 {¶ 35} "[DEFENSE COUNSEL]: I think I have the right to ask him whether or not —
 {¶ 36} "THE COURT: Not on the rape shield law.
 {¶ 37} "[DEFENSE COUNSEL]: About the fact that if she had masturbated with anything?
 {¶ 38} "[THE STATE]: There is no evidence to substantiate that. It's merely a fishing expedition to find some other cause, and we absolutely have to object to any questioning —
 {¶ 39} "THE COURT: I'm going to sustain the question over [defense counsel's] request."
 {¶ 40} Ohio's Rape Shield Law is contained in R.C.2907.02(D), which states:
 {¶ 41} "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. * * *"
 {¶ 42} The rape shield law prohibits the introduction of any extrinsic evidence pertaining to past sexual activity by the alleged victim. State v. Guthrie (1993), 86 Ohio App.3d 465,467. The evidence is not to be admitted unless the trial court determines it is material to a fact at issue and that its prejudicial nature does not outweigh its probative value. Statev. Leslie (1984), 14 Ohio App.3d 343. It is within the sound discretion of the trial court to determine the relevancy of evidence in a rape prosecution and to apply Ohio's rape shield law in a manner which best meets the purpose behind the statute. Id. at 346.
 {¶ 43} In this case, defense counsel established that Dr. Schlievert could not state within a reasonable degree of medical certainty when or by what means the victim's hymen was injured. Dr. Schlievert had already testified that penile penetration could have caused the cleft. As such, we find that the trial court did not abuse its discretion in precluding appellant's counsel from asking further questions about whether consensual sex or masturbation with foreign objects by the victim could have caused her injury. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 44} Appellant argues in his fourth assignment of error that his sentence was not supported by the facts and was unconstitutional. Appellant faced a mandatory prison term of one to ten years on each rape conviction and one to five years on each gross sexual imposition conviction. Appellant argues that the trial court abused its discretion by sentencing him to more than the minimum and by ordering consecutive sentences.
 {¶ 45} R.C. 2929.14(B), the trial court is required to impose the shortest prison term authorized for the offense, unless one or more of the following applies:
 {¶ 46} "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
 {¶ 47} "(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 48} The trial court found that R.C. 2929.14(B)(2) applied in this case and ordered appellant to serve 9 years as to each of the rape convictions and 4 years as to each of the convictions of gross sexual imposition, which were greater than the shortest prison term authorized. Having made the appropriate finding pursuant to R.C. 2929.14(B)(2), we find that the trial court did not abuse its discretion in ordering appellant to serve more than the minimum sentence authorized.
 {¶ 49} With respect to the trial court's imposition of consecutive sentences, appellant argues that the trial court's order of consecutive sentences should be overturned because the trial court's order was based on "unarticulated findings of fact," and on the authority of Blakely v. Washington (2004),542 U.S. 296, and State v. Mason, 8th Dist. No. 84061,2004-Ohio-5388. This court has previously held that the decision in Blakely does not apply to Ohio's indeterminate sentencing scheme. State v. Curlis, 6th Dist. No. WD-04-032,2005-Ohio-1217, at ¶ 18. Nevertheless, we find that the trial court failed to comply with R.C. 2929.14(E)(4) and State v.Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at paragraph one of the syllabus.
 {¶ 50} This court recently set forth the applicable law with respect to the imposition of consecutive sentences for multiple offenses in State v. Warden, 6th Dist. No. WD-03-065, 2006-Ohio-0026, at ¶ 20, which states:
 {¶ 51} "A trial court may not impose consecutive sentences for multiple offenses unless it finds the existence of three factors set forth in R.C. 2929.14(E)(4). Pursuant to that statute, the trial court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; and (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. As to the third finding, the trial court must hold that one of the following is applicable: (1) the offender committed the multiple offenses while awaiting trial or sentencing, while under a sanction imposed or while under post-release control for a prior offense; or (2) that the harm caused by the multiple offenses was so great or unusual that no single prison term would adequately reflect the seriousness of the offender's conduct; or (3) that the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(E)(4)(a) through (c). R.C. 2929.19(B)(2)(c) provides that the court must give its reasons for these findings. The court's findings and reasons for those findings must be made on the record at the offender's sentencing hearing. State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, at paragraph one of the syllabus."
 {¶ 52} At appellant's sentencing hearing, the trial court stated:
 {¶ 53} "The Court finds as provided for and to fulfill the purposes of Revised Code 2929.11, and it being not disproportionate for the seriousness of the offender's conduct or the danger the offender poses, that the sentences for Counts 1 and 2, those concurrent sentences be served consecutively with the concurrent sentences for Counts 3 and 4.
 {¶ 54} "The Court expressly finding that defendant's criminal history requires consecutive sentences."
 {¶ 55} The above quotation contains the full extent of the trial court's discussion related to the imposition of consecutive sentences. Thus, we are compelled to conclude that, although the trial court made the requisite findings, pursuant to R.C.2929.14(E)(4), the court failed to comply with R.C.2929.19(B)(2)(c), by not giving its reasons for imposing consecutive sentences. The trial court must "clearly align each rationale with the specific finding to support its decision to impose consecutive sentences." Comer, 2003-Ohio-4165, at ¶ 21.
 {¶ 56} Having found that the trial court failed to comply with the strict technical requirements of R.C. 2929.14(E)(4), as required by Comer, see State v. Bartl, 6th Dist. No. S-03-026, 2004-Ohio-3451, at ¶ 8, we must reverse that portion of the trial court's judgment which ordered appellant to serve consecutive sentences. Accordingly, we find appellant's fourth assignment of error, as it relates to imposition of a sentence greater than the minimum, not well-taken. With respect to consecutive sentences, however, we find appellant's fourth assignment of error well-taken.
 {¶ 57} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed with respect to appellant's convictions and concurrent sentences. The trial court's judgment imposing consecutive sentences, however, is reversed. This matter therefore is remanded to the trial court for resentencing in accordance with this decision and the applicable law. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Parish, J., concur.
[1] Brackets are to indicate corrected spelling or punctuation errors only.
[2] The determination of when appellant was in the fourth grade can be calculated from the victim's testimony regarding when she was to begin seventh grade. There is, however, a discrepancy in the record regarding when the victim started seventh grade. Dr. Schlievert's report indicated that the victim would be starting seventh grade in August 2003, but the victim testified at trial that she was starting seventh grade that August, in 2004. Hence, she would have started fourth grade in either August 2000 or August 2001. We find this discrepancy to be immaterial because, under either calculation, the victim would have been in the fourth grade during the time period alleged in the indictment.