DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant John Goff ejaculated into a cup to obtain semen for injection into his sixteen-year-old stepdaughter's vagina. Mr. Goff and his wife, Narda Goff, claimed that the stepdaughter injected the semen into her own vagina while they were not present. According to them, they provided a semen filled syringe to the stepdaughter because she wanted to have a baby, and they were willing to raise the baby. The stepdaughter, on the other hand, claimed that Mr. and Mrs. Goff asked her to have Mr. Goff s baby because Mrs. Goff was no longer able to have children. The stepdaughter testified that she only agreed after Mr. Goff threatened to kill Mrs. Goff if the stepdaughter did not agree. According to *Page 2 
her, Mr. Goff twice used a syringe to inject his semen into her vagina. The stepdaughter became pregnant and gave birth to his son.
 {¶ 2} Mr. Goff was tried to a jury in 2002 and convicted on two counts of rape, two counts of sexual battery, and one count of child endangering. Those convictions were eventually reversed based on the decision of the United States Supreme Court in Crawford v.Washington, 541 U.S. 36 (2004). State v. Goff, 9th Dist. No. 21320,2005-Ohio-339, at ¶ 1. Mr. Goff was again tried to a jury on the same charges in 2006 and again convicted.
 {¶ 3} Mr. Goff has assigned five errors on appeal: (1) that the trial court incorrectly denied his motion to change venue; (2) that the trial court incorrectly allowed the prosecutor to elicit other act evidence concerning alleged sexual contact between him and his stepdaughter; (3) that his trial counsel was ineffective because he failed to object to the other act evidence elicited by the prosecutor; (4) that his conviction is against the manifest weight of the evidence; and (5) that the trial court incorrectly used facts not found by the jury in imposing the maximum sentence on his rape convictions and directing that the sentences on those convictions would run consecutively, that the trial court abused its discretion by sentencing him to twenty years imprisonment, and that he was denied equal protection because Mrs. Goff was sentenced to only three years imprisonment for her participation in those same crimes. This Court affirms the trial court's judgment because: (1) the trial court conducted a careful and searching *Page 3 
examination of potential jurors and none of the jurors that Mr. Goff objected to based upon their exposure to pretrial publicity were ultimately seated on the jury; (2) Mr. Goff failed to object to the testimony regarding his alleged prior sexual contact with his stepdaughter at the time it was elicited and the admission of that testimony did not amount to plain error; (3) Mr. Goff has failed to demonstrate that, if it was error for his lawyer to fail to object to the testimony regarding his alleged prior sexual contact with his stepdaughter, he was prejudiced by that error; (4) this Court cannot conclude that the jury lost its way and created such a manifest miscarriage of justice by convicting Mr. Goff that his conviction must be reversed; and (5) the trial court's imposition of sentence in this case did not violate Mr. Goff s right to a jury trial, the trial court did not abuse its discretion in imposing sentence on Mr. Goff, and Mr. Goff s right to equal protection was not violated by the trial court's sentence.
 I. {¶ 4} John Goff married Narda Goff in 1987. At that time, Mrs. Goff's daughter, the alleged victim in this case, was four years old. Mrs. Goff testified that, following the marriage, she, Mr. Goff, and the alleged victim "functioned as a family."
 {¶ 5} There was evidence presented at trial that the alleged victim had a learning disability. She was held back in both kindergarten and third grade. When she was in fifth grade, an evaluation of her social emotional status, done by the *Page 4 
public school she was attending, indicated that she had a low confidence level. That same year, the Goffs withdrew her from school and began home schooling her. They testified that they believed she was dyslexic, although there was no evidence other than their testimony to support that conclusion. They were still home schooling her at the time she became pregnant.
 {¶ 6} Mrs. Goff testified that the alleged victim approached her shortly after having turned sixteen and told her that she wanted to have a baby. Mrs. Goff claimed that she tried to dissuade her, telling her "what childbirth felt like" and that she was "too close to graduating." Mrs. Goff testified that the alleged victim would not be dissuaded and approached her three more times in the next three or four weeks. According to Mrs. Goff, she took the alleged victim to a gynecologist because she thought "she might have a chemical imbalance. . . stirring up the mothering desire." Mrs. Goff claimed that the gynecologist told her "[t]here's nothing abnormal with a 16-year-old wanting to have a baby, sometimes they do." The gynecologist gave her birth control pills "to put her on for a month or two months to see if they would help." Mrs. Goff explained to the jury that the girlfriend of the alleged victim's older brother was pregnant and "that increased her desire to want to have a baby and it was like a sibling rivalry." Mrs. Goff claimed the alleged victim threatened to run away and get pregnant, so she and Mr. Goff agreed that Mrs. Goff would "harvest" Mr. Goffs semen and give it to the alleged victim so she could use it to impregnate herself. Mrs. Goff testified *Page 5 
that Mr. Goff was not in the room with his stepdaughter when the stepdaughter injected his semen into her vagina.
 {¶ 7} Mr. Goff s testimony was, for the most part, consistent with Mrs. Goffs. He agreed that the idea of his stepdaughter's pregnancy originated with the stepdaughter. According to him, the stepdaughter proposed alternative ways of becoming pregnant. She suggested in vitro fertilization with her bearing Mr. and Mrs. Goffs child. She also suggested that she would find a boy to impregnate her, either with or without running away from home. Finally, she suggested artificial insemination using Mr. Goffs semen. Mr. Goff testified that, because he and Mrs. Goff were unable to dissuade his stepdaughter, they entered into an agreement with her. They agreed that Mr. Goff would provide semen to the stepdaughter for a month that she would use to try to become pregnant. If she was successful, "then that was an act of God." If she was unsuccessful, and she still chose to have a child, they "could not protect her from the negative aspects which might be entailed in that process." As part of the arrangement, Mr. and Mrs. Goff agreed that they "would take complete responsibility and care of the child, and that [the stepdaughter] could have access to the child whenever she wanted, but the child was to remain with [Mr. and Mrs. Goff] for its entire life until it was ready-he was ready to move on about his life."
 {¶ 8} The alleged victim's version of events was significantly different. She testified that, shortly before she turned sixteen, her mother and stepfather *Page 6 
approached her and said they wanted her to have Mr. Goff s baby. She explained that she knew her mother could no longer have children because she had had a hysterectomy. She said that she initially told them no, but then said she would think about it.
 {¶ 9} She testified that Mr. Goff next brought up the subject at a time when Mrs. Goff was not present. According to her, she had been outside doing some chores and was on the stoop when Mr. Goff came from inside the house carrying a handgun. She said that he told her that if she did not have his baby, he would kill her mother. The stepdaughter testified that, at that point, she had "no other choice," so she said yes.
 {¶ 10} She testified that Mrs. Goff was "planning my fertility" and "knew exactly when I was . . . most fertile and everything else like that." She further testified that, sometime during the first two weeks of December 1998, she was in her bedroom recovering from having her wisdom teeth extracted when Mr. Goff entered the room carrying a syringe containing his semen. According to her, "John came in to my bedroom, he had the syringe, and he shoved it into my vagina." She claimed that, a few days later, when Mrs. Goff was not around, Mr. Goff told her that he was going to "try this one more time, but this time I want you to help." She testified that she helped him ejaculate into a cup and that she filled the syringe from the cup. At Mr. Goff s direction, she handed him the syringe, and he used it to inject his semen into her vagina. The alleged victim testified that *Page 7 
Mrs. Goff purchased a home pregnancy test on Christmas Eve and that her being pregnant was Mr. Goff s Christmas gift.
 {¶ 11} The alleged victim delivered a baby boy on September 4, 1999. Both Mr. and Mrs. Goff were present in the delivery room.
 {¶ 12} The alleged victim testified that Mr. Goff instructed her to tell people that the baby's father had moved to Florida and did not "want any part of the baby." She testified that she told that story to hospital personnel. Mr. Goff s name appears on the birth certificate as the baby's father. According to the alleged victim, Mr. Goff told hospital personnel that he wanted his name on the birth certificate "for insurance fraud."
 {¶ 13} Following the baby's birth, the alleged victim returned to Mr. and Mrs. Goff s home. During September 2000, shortly after her baby turned one year old, the alleged victim met and began dating Greg Suchy. At first, she told Mr. Suchy the story about the baby's father moving to Florida. In December 2000, however, she told him that Mr. Goff was the father. Shortly after that, Mr. and Mrs. Goff confirmed to Mr. Suchy that Mr. Goff was the baby's father. A few weeks later, the alleged victim moved into Mr. Suchy's parents' house. The baby remained with the Goffs.
 {¶ 14} The alleged victim testified that she told Mr. Suchy's parents that her stepfather was the father of her baby, and they told her "that's wrong, that is *Page 8 
like totally wrong." She then went to the Stow Police Department and reported how she had become pregnant.
 {¶ 15} Eventually, the alleged victim removed the baby from the Goffs' home. She, however, surrendered him to foster care and eventually he was adopted.
 {¶ 16} The police interviewed Mr. and Mrs. Goff, and Mr. Goff was charged with two counts of rape, two counts of sexual battery, and one count of child endangering. As mentioned previously, he was tried and convicted, but his conviction was reversed because of a case decided by the United States Supreme Court. He was retried and again convicted on all five counts against him. He has now appealed to this Court.
 II. A. {¶ 17} Mr. Goff has argued that the trial court incorrectly denied his motion to change venue. Rule 18 of the Ohio Rules of Criminal Procedure allows a trial court to transfer a case for trial "when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." An appellate court reviews a trial court's ruling on a motion to change venue using an abuse of discretion standard.State v. Maurer, 15 Ohio St. 3d 239, 250 (1984) (quoting State v.Fairbanks, 32 Ohio St. 2d 34, 37 (1972)). *Page 9 
 {¶ 18} Although this assignment of error is an attack on the trial court's denial of Mr. Goffs motion to change venue, he has placed his primary reliance on a case that did not directly deal with a request to change venue. In reliance upon United States v. Williams, 568 F.2d 464
(5th Cir. 1978), he has argued that pretrial and during-trial publicity in this case was particularly prejudicial because it included the fact that he had been tried and convicted before and that that conviction had been reversed. In Williams, the United States Court of Appeals for the Fifth Circuit reversed a criminal conviction because two jurors were exposed to during-trial publicity that included the fact that the defendants had been convicted in a previous trial:
 [W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged. Accordingly, we hold that the exposure of the two jurors to information regarding defendants' convictions at the first trial resulted in an unfair second trial.
Id. at 471. The court in Williams specifically held that the trial court's curative instructions did not remedy the prejudice to the defendants. Id.
 {¶ 19} No Ohio court has adopted the rule established inWilliams, and this case does not present a situation in which it is necessary for this Court to determine whether to do so. The facts in this case are distinguishable from those that were before the court inWilliams. While jury members in that case were exposed to during-trial publicity that included the fact that the defendants had been previously convicted, Mr. Goff has not shown that any of the people who *Page 10 
ultimately served on the jury in this case were exposed to publicity concerning his prior conviction.
 {¶ 20} There is no doubt that this case, including Mr. Goff s initial trial and conviction, received extensive publicity, both locally and nationally. That publicity alone, however, did not require a change of venue if it remained possible to seat a fair and impartial jury in Summit County. The Ohio Supreme Court has recognized that the best way for a trial court to determine whether a fair and impartial jury can be seated is by conducting "a careful and searching" voir dire examination of potential jurors:
 We have long held that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community.
State v. Roberts, 110 Ohio St. 3d 71, 2006-Ohio-3665, at ¶ 116. The trial court in this case conducted just such a careful and searching examination.
 {¶ 21} The trial court's examination of potential jurors regarding their prior knowledge began with having each of them complete a questionnaire, which, among other things, asked about their prior knowledge. The trial court then spent more than three days during which it, the prosecutor, and Mr. Goff s lawyers examined each potential juror individually regarding, among other things, their prior knowledge about the case and, to the extent they had any such prior knowledge, whether their ability to be a fair and impartial juror was tainted by it. *Page 11 
 {¶ 22} Initially, Mr. Goff has cited the individual examinations of nine potential jurors as support for his argument that the trial court abused its discretion by not granting his motion for a change of venue. Immediately following the individual examinations of each of the nine, Mr. Goff requested that the trial court dismiss that person for cause but, in each case, the trial court refused.
 {¶ 23} The first potential juror relied upon by Mr. Goff as support for his change of venue motion was Mr. Barath. Mr. Barath stated that he had a general knowledge of the allegations against Mr. Goff from having read about the case in the Akron Beacon Journal. He was aware that Mr. Goff had been tried before, although he could not remember why he was being retried. The trial court did not immediately dismiss Mr. Barath as a potential juror, stating that it would hold that decision "in abeyance." It is unclear whether the trial court ultimately dismissed Mr. Barath from the panel because of his prior knowledge. He does not, however, appear to have served on the jury. (The only place in the record that contains a complete list of the jurors is their signatures on the verdict forms. Some of the signatures are difficult to read, but Mr. Barath's does not appear to be among them, and Mr. Goff has not asserted that he was on the jury.)
 {¶ 24} The second potential juror relied upon by Mr. Goff was Mr. Campisi. Mr. Campisi displayed a great deal of confusion during his individual examination, but unequivocally stated that he had not read or heard anything in the media about Mr. Goff or the charges against him, and the trial court refused to *Page 12 
dismiss him at that time. Following all the individual examinations, when the potential jurors then remaining returned to the courtroom for further voir dire, the trial court asked if any of them had obtained more information about the case following their individual examinations. Mr. Campisi indicated that he had and, upon examination by the court, admitted that, despite the court's admonition, he had read an article about the case in the Akron Beacon Journal. The trial court thereupon dismissed him from the panel.
 {¶ 25} The third potential juror relied upon by Mr. Goff was Ms. Green. Ms. Green stated that she had no prior knowledge of the case. In fact, Mr. Goff s request that she be dismissed for cause was not based upon an assertion that she had prior knowledge. Rather, it was because she had initially equivocated about whether she could be impartial in view of the nature of the charges against Mr. Goff. Upon further questioning, she stated that she had not understood the process and that, upon being told that there would be a lot of different evidence and that the judge would instruct her that Mr. Goff was presumed innocent, she stated that she would not have a problem being fair and impartial. Ms. Green ultimately sat on the jury. Because there was no evidence that she was exposed to any pretrial evidence, it is unclear why Mr. Goff has relied upon her in support of his argument that his motion for a change of venue should have been granted.
 {¶ 26} The fourth potential juror relied upon by Mr. Goff was Mr. Morris. Mr. Morris stated that he believed he had some recollection of having heard about *Page 13 
the case from television news. He said that what stuck in his mind was artificial insemination because he did not normally associate artificial insemination with rape. He also said that he believed he recalled that the alleged victim's mother had not done anything "to prevent it or did not intercede." Although he was not directly asked whether he remembered anything he may have heard about the procedural posture of the case, he did state that he had recited everything he remembered. He committed that, if he were seated on the jury, he would be able to set aside what he had heard and decide based solely on the evidence presented. The court denied Mr. Goff s request that Mr. Morris be dismissed for cause. Ultimately, Mr. Goff used a preemptory challenge to dismiss him.
 {¶ 27} The fifth potential juror relied upon by Mr. Goff was Ms. Wallace. In completing her questionnaire, she indicated that she understood that the potential victim had been artificially inseminated by her mother with her father's sperm and that she had given the baby up for adoption. Upon questioning, she indicated she had read about the underlying facts in both the Akron Beacon Journal and the Stow Sentry. She specifically stated that she did not know anything about the "history of the court case." She indicated that she would be able to set aside what she had read in the newspapers. The trial court denied Mr. Goff s request that Ms. Wallace be dismissed for cause. She was ultimately dismissed as an alternate juror by Mr. Goff using a preemptory challenge. *Page 14 
 {¶ 28} The sixth potential juror relied upon by Mr. Goff was Ms. Lopez. She stated that Mr. Goff s name sounded familiar when he was initially introduced and that the questionnaire had refreshed her recollection that she had heard about the facts on the news, although she was unable to recall "a lot of the details." She specifically said that she did not know anything about the history of the case. Ms. Lopez also informed the court that another potential juror had said that that potential juror had already made up her mind that Mr. Goff was guilty. Mr. Goff requested that the trial court remove Ms. Lopez for cause, but his argument appeared to be based on her exposure to the other juror rather than upon pretrial publicity. The trial court refused to dismiss her from the panel, but she does not appear to have ultimately served on the jury.
 {¶ 29} The seventh potential juror relied upon by Mr. Goff was Mr. Kyser. Mr. Kyser stated that he reads the Akron Beacon Journal and the Cleveland Plain Dealer daily and that he had some recollection of the facts of the case, although he did not recall Mr. Goff s or the alleged victim's names. He specifically said that he did not know anything about the proceedings in the case. Although the trial court did not dismiss him for cause, he does not appear to have served on the jury.
 {¶ 30} The eighth potential juror relied upon by Mr. Goff was Ms. Eldridge. Ms. Eldridge acknowledged that she recalled some of the facts underlying the prosecution against Mr. Goff from having read about them "five or six years ago." She specifically stated that she did not know anything about what had occurred in *Page 15 
the court proceedings. She also stated that she believed she could sit on the jury and render a fair and unbiased decision because she "would have the facts." The trial court refused to dismiss Ms. Eldridge for cause, but she does not appear to have sat on the jury.
 {¶ 31} The ninth potential juror relied upon by Mr. Goff was Mr. Schaefer. Mr. Schafer acknowledged that he had heard something about a stepfather impregnating his stepdaughter, but that was all he could recall about it. He was not directly asked whether he knew anything about the procedural posture of the case. He specifically said that the fact that he had some recollection of having heard about the allegations would not have any bearing on his ability to sit on the jury because he was "the type of person that's innocent until proven guilty or you hear the facts." The trial court refused to dismiss Mr. Schaefer for cause, but he does not appear to have served on the jury.
 {¶ 32} Mr. Goff has also pointed to two other jurors, Mr. Broscheid and Ms. Kocsis. Neither of them had been exposed to publicity prior to initially reporting for jury duty, but between their initial appearance and their individual examinations, they both inadvertently learned that Mr. Goff had been tried previously. The trial court dismissed both for cause.
 {¶ 33} Mr. Goff has also suggested that one of the jurors who had indicated on his questionnaire that he had no previous knowledge about the case had said to another, "in an incredulous tone," "what you didn't hear about this case?" In fact, *Page 16 
Ms. Oldham, the juror who reported the question being asked of her by another juror, Mr. Sturgis, said nothing about Mr. Sturgis's tone. Rather, upon being asked whether she had ever heard anyone else discuss the case responded:
 The guy next to me, because I wrote down, "No, you haven't heard about anything?" "No."
It is not clear from what Ms. Oldham reported that Mr. Sturgis was implying that he had prior knowledge of the case. Further, by the time Ms. Oldham reported Mr. Sturgis's comment, the trial court had already dismissed Mr. Sturgis based upon difficulty that would have been caused by his absence from work during the trial.
 {¶ 34} Mr. Goff has pointed out that two potential jurors, Mr. Campisi and Ms. Rennie, saw a newspaper story between the time of their individual examinations and when all the potential jurors reported back to the court that indicated that Mr. Goff had been tried before. As mentioned previously, upon Mr. Campisi informing the trial court of having read the story, it immediately dismissed him for cause. The trial court also dismissed Ms. Rennie for cause.
 {¶ 35} Finally, Mr. Goff has suggested that the need for a change of venue was supported by the fact that one juror failed to indicate on her questionnaire or during her individual examination that a member of her family had been a victim of a sexual offense. The juror's daughter had accused the juror's father of sexually abusing her. The juror's father committed suicide, and the juror's daughter later confessed that, while there was some truth to her allegation, it was *Page 17 
not totally truthful. The juror explained that she had initially withheld the information because she "kind of froze when [the court] asked me the question if I had any experience in the past." Upon the juror's informing the trial court of the situation, it dismissed her for cause. This situation had nothing to do with pretrial publicity.
 {¶ 36} Of all the potential jurors relied upon by Mr. Goff, then, it appears that only one, Ms. Green, actually sat on the jury. Mr. Goff s request that she be dismissed had nothing to do with pretrial publicity. As has been recognized by the Ohio Supreme Court, if potential jurors who were exposed to pretrial publicity do not end up sitting on the jury, the defendant has not been prejudiced by that publicity. State v.Roberts, 110 Ohio St. 2d 71, 2006-Ohio-3665, at ¶ 119 (citing State v.Tresh, 90 Ohio St. 3d 460, 464 (2001)). Accordingly, Mr. Goff was not prejudiced by pretrial publicity in this case.
 {¶ 37} Mr. Goff has suggested that a number of the potential jurors that he has brought to this Court's attention failed to follow the trial court's admonitions or were less then honest in filling out their questionnaires or in responding to questions from the court. Assuming that is true, although it is not true in regard to all the potential jurors about whom he has made the suggestion, none of those potential jurors ultimately served on the jury. To the extent he has suggested that, because some potential jurors failed to follow the trial court's admonitions or were less than honest, this Court should infer that other potential jurors failed to follow *Page 18 
the trial court's admonitions or were less than honest, no such inference would be appropriate. It would be improper for this Court to engage in such speculation.
 {¶ 38} The trial court's careful and searching examination of the potential jurors in this case insured that pretrial publicity did not prevent Mr. Goff from receiving a fair trial in Summit County. Mr. Goff s first assignment of error is overruled.
 B. {¶ 39} Mr. Goff s second assignment of error is that the trial court incorrectly allowed the prosecution to elicit other act evidence concerning a specific alleged incident of sexual activity between him and his stepdaughter. He has also complained that the trial court did not hold a hearing prior to evidence of that incident being introduced.
 {¶ 40} Rule 404(B) of the Ohio Rules of Evidence provides that other act evidence is not admissible to prove a person's character in order to show that he acted in conformity with that character. It further provides, however, that such evidence may be admissible for other purposes:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
When a defendant has been charged with rape and the other act evidence is evidence regarding the defendant's sexual activity, Section 2907.02(D) of the *Page 19 
Ohio Revised Code is a further hurdle to its admissibility. As relevant to this case, Section 2907.02(D) provides:
 Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves . . . the defendant's past sexual activity with the victim, . . . and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
Section 2907.02(E) requires that, prior to receiving evidence regarding sexual activity of a defendant in a rape case, the trial court must hold a hearing in chambers regarding the admissibility of that evidence.
 {¶ 41} Mr. Goff moved in limine for an order prohibiting the State from introducing any evidence regarding alleged sexual activity between him and his stepdaughter other than the specific conduct for which he was charged in this case. Apparently the trial court held a hearing prior to trial, although the record in this case does not include a transcript of that hearing. Following jury selection and prior to opening statements, at a time when the jury was not in the courtroom, there was discussion among the trial court and counsel regarding that hearing. The trial court stated that Mr. Goff had filed a motion "concerning the matter of the alleged other sexual activity of the defendant with the victim" and that a hearing had been held "well in advance of trial." The court and counsel then discussed a specific incident having to do with Mr. Goff s supposed removal of a lipstick cap from the alleged victim's vagina. The trial court indicated that its preliminary *Page 20 
belief regarding that alleged incident was that evidence of it would not be admissible, although it further stated that its admissibility was "a close call, and so what happens in my rulings after direct evidence and what may be precipitated by cross-examination if there's another question, so that's my thinking on that particular event that we have discussed." The prosecutor then indicated that he did not intend to introduce evidence regarding the lipstick cap incident but, if his intention changed, he would request a side bar conference in order to alert the court:
 Judge, I would ask for a side bar if I felt the need to elicit that information.
There was no discussion at that time regarding any other alleged sexual activity between Mr. Goff and the alleged victim.
 {¶ 42} No evidence of the lipstick cap incident was ever proffered. Evidence of what appears to be a different incident of alleged sexual activity between Mr. Goff and the alleged victim, however, was elicited by the prosecutor.
 {¶ 43} On direct examination, the alleged victim testified that she had attempted suicide four times. One of those times, she had taken a large number of pills. The prosecutor asked where she had gotten the pills, and she responded that most of them were over-the-counter medications, but that she had also taken Vicodin, which had been prescribed for her because she had endometriosis. The prosecutor then asked how she had gotten endometriosis, and she responded that *Page 21 
she was "not exactly sure," but that "they found [it]" after she had given birth to her son. The prosecutor than asked about the symptoms she had exhibited:
 Q. Describe what that's like. What are the symptoms?
 A. Shooting pain in the lower abdomen, heavy periods, lot of clotting, lot of bleeding.
 Q. That never occurred prior to the birth of your son?
 A. No.
 {¶ 44} On cross examination, Mr. Goff s lawyer questioned the alleged victim about an incident a couple of years before her pregnancy when, during a trip to Michigan, she had visited a hospital because of vaginal bleeding. He asked whether she knew what she had been diagnosed with having, and she responded that she did not.
 {¶ 45} On redirect examination, the prosecutor questioned the alleged victim about her visit to the hospital:
 Q. Okay. They also talked to you about the trip to the hospital in Michigan. Remember that?
 A. Yes.
 Q. You have been asked about that previously, haven't you?
 A. Yes.
 Q. And you have previously indicated what that was from, haven't you?
 A. Yes.
 Q. What is it that caused the bleeding from your vaginal cavity on that trip to Michigan on, I think, your grandfather's birthday? *Page 22 
 A. Yes.
 Q. What caused that?
 A. He fist raped me. John Goff fist raped me.
 Q. And, of course, you wouldn't have those medical records, would you?
 A. No, I wouldn't.
 Q. You had reported that previously-
 A. Yes.
 Q. — when asked about that.
 A. Yes.
 {¶ 46} As mentioned previously, Mr. Goff has complained that the trial court failed to hold a hearing as required by Section 2907.02(E) prior to introduction of the alleged victim's testimony regarding the supposed fist rape. The trial court apparently did hold a hearing regarding other act evidence, but a transcript of that hearing was not included in the record before this Court. Mr. Goff, as the appellant, had a duty to provide this Court a sufficient record to demonstrate his claimed errors. Knapp v. Edwards Labs., 61 Ohio St. 2d 197, 199 (1980). In view of his failure to provide a transcript of the other acts evidence hearing held before the trial court, this Court must assume that hearing included consideration of the admissibility of the fist-rape evidence:
 When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no *Page 23 
choice but to presume the validity of the lower court's proceedings, and affirm.
Id. Accordingly, to the extent Mr. Goff s second assignment of error is based upon the trial court's alleged failure to hold a hearing prior to receiving the fist-rape evidence, it is overruled.
 {¶ 47} Regardless of whether the trial court held the required hearing, Mr. Goff has argued that it should not have allowed the alleged victim to testify regarding the claimed fist rape. He failed, however, to object at the time the prosecutor elicited that testimony. This Court need not consider a claimed error that an appellant failed to bring to the trial court's attention at a time when that court could have avoided or corrected the supposed error. State v. Williams, 51 Ohio St. 2d 112,116-117 (1977).
 {¶ 48} Defendant has suggested that, by allowing the testimony at issue, the trial court committed plain error. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." State v. Wogenstahl,75 Ohio St. 3d 344, 357 (1996). This Court cannot hold that, but for the alleged victim's statement that Mr. Goff fist raped her, he would not have been convicted in this case. Accordingly, Mr. Goff s second assignment of error is overruled.
 C. {¶ 49} Mr. Goff s third assignment of error is that his trial counsel was ineffective because he failed to object to the other act evidence elicited by the *Page 24 
prosecutor. In order to obtain a reversal based upon ineffective assistance of trial counsel, a defendant must show that his lawyer's performance was deficient and that he was prejudiced by that deficiency:
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington, 466 U.S. 668, 687 (1984).
 {¶ 50} It is significant that Mr. Goff has not argued that his lawyer was ineffective by injecting the alleged victim's Michigan hospital visit into this case. By doing so, he made her testimony regarding the reason for that visit material to her credibility. As outlined above, although other acts evidence is not admissible to prove a person's character in order to show that he acted in conformity with that character, it can be admitted for other purposes. Evidence of a defendant's past sexual activity with the alleged victim is admissible in a rape case if it is material to a fact at issue in the case and its inflammatory or prejudicial nature does not outweigh its probative value.
 {¶ 51} Mr. Goff s lawyer attempted to impeach the alleged victim's testimony that she never had endometriosis until after the birth of her son by eliciting testimony from her about her hospital visit. By doing so, he placed the reason for that hospital visit at issue. He implied that she had visited the hospital *Page 25 
because she had endometriosis, which would have meant that she had lied about not having it prior to the birth. Had Mr. Goff objected, the issue before the trial court would have been whether the inflammatory or prejudicial nature of her assertion that Mr. Goff fist raped her outweighed its probative value in rehabilitating her testimony about the reason for her hospital visit.
 {¶ 52} When a determination of whether certain evidence is admissible calls upon a trial court to weigh that evidence's inflammatory or prejudicial nature against its probative value, its admissibility is within the trial court's sound discretion. See State v. Hines, 6th Dist. No. L-04-1234, 2006-Ohio-322, at ¶ 42. Mr. Goff has asserted in his brief to this Court that the sole issue in this case was whether the alleged victim consented to being artificially inseminated in order to carry John Goff s child. Her credibility, therefore, was critical to the prosecution's case, making her testimony regarding why she visited the hospital highly probative once Mr. Goff s lawyer had injected it into the case. There is no doubt that that testimony was also inflammatory and highly prejudicial to Mr. Goff. It is not clear, however, that, had Mr. Goff s lawyer objected to that testimony, the trial court would have excluded it. If the trial court had allowed it, this Court would not be able to conclude that it had abused its discretion in doing so.
 {¶ 53} In order to demonstrate prejudice, a defendant must show that "there exists a reasonable probability that, were it not for counsel's error, the result of the *Page 26 
trial would have been different." State v. Bradley, 42 Ohio St. 3d 136,143 (1989). Assuming that Mr. Goffs lawyer erred by not objecting to the alleged victim's fist-rape testimony, Mr. Goff has not demonstrated that he was prejudiced by that error. Accordingly, Mr. Goffs third assignment of error is overruled.
 D. {¶ 54} Mr. Goffs fourth assignment of error is that his conviction is against the manifest weight of the evidence. When a defendant argues that his conviction is against the manifest weight of the evidence, an appellate court must review the entire record:
 [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten, 33 Ohio App. 3d 339, 340 (1986).
 {¶ 55} Mr. Goff has argued in particular that his stepdaughter's testimony about him allegedly threatening to kill Mrs. Goff in order to convince the stepdaughter to agree to have his baby was unbelievable. He has attempted to draw support for this argument from a statement made by the trial court in the course of explaining its determination that Mr. Goff was a sexually oriented offender:
 The jury commented on the emotionally powerful presentation of this man and they found the force, as the jury instructions allowed, through that vehicle and found that testimony more convincing than *Page 27 
the threat of harm that was, according to [the alleged victim], made while the defendant held a gun. . . .
According to Mr. Goff, the trial court's statement showed that the jury had not believed the alleged victim's testimony that Mr. Goff had threatened to kill Mrs. Goff in order to convince the alleged victim to have his baby. It would be inappropriate for this Court to rely upon a hearsay statement by the trial court to impeach the jury's verdict.
 {¶ 56} This Court has reviewed and weighed the testimony that was before the jury. As outlined previously, Mr. and Mrs. Goff gave one version of the circumstances by which the alleged victim came to be pregnant with Mr. Goff s baby and the alleged victim gave another version of those circumstances. This Court cannot conclude that the jury lost its way and created such a manifest miscarriage of justice by believing the alleged victim's version that Mr. Goff s conviction must be reversed and a new trial ordered. Mr. Goff s fourth assignment of error is overruled.
 E. {¶ 57} Mr. Goff s final assignment of error is that the trial court incorrectly used facts not found by the jury in imposing sentence and directing that the sentences for his rape convictions would run consecutively. He has also suggested that, the trial court abused its discretion and violated his right to equal protection in sentencing him. *Page 28 
 {¶ 58} In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court considered whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum sentence applicable for a crime be made by a jury based upon proof beyond a reasonable doubt. The court held that it does:
 Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.
Id. at 490.
 {¶ 59} In Blakely v. Washington, 542 U.S. 296 (2004), the United States Supreme Court clarified that the term "maximum sentence," as that term was used in Apprendi, means the maximum sentence that a judge may impose based solely upon a jury's verdict or a defendant's admission:
 Our precedents make clear . . . that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.
Id. at 302 (emphasis in original). Because Washington's determinate-sentencing scheme provided for an increase in the maximum sentence applicable based upon judicial fact finding, the court concluded that it violated the right to jury trial guaranteed by the Sixth Amendment. Id. at 305.
 {¶ 60} In United States v. Booker, 543 U.S. 220 (2005), the United States Supreme Court determined that its reasoning in Blakely applied to the Federal Sentencing Guidelines and, based upon that reasoning, held that certain parts of *Page 29 
those guidelines violated the Sixth Amendment. The court held that it was the fact that the guidelines were mandatory that caused them to be unconstitutional:
 If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. . . . Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges; . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.
Id. at 233. Inasmuch as it was the mandatory nature of the guidelines that rendered them invalid, the court fashioned a remedy by severing and excising the provisions that made them mandatory. Id. at 245-246, 258-259. It further held that appeals from sentencing decisions would still be possible, but that the standard of review in all such appeals would be one of reasonableness. Id. at 261.
 {¶ 61} In State v. Foster, 109 Ohio St. 3d 1, 2006-Ohio-856, the Ohio Supreme Court considered the application of Apprendi, Blakely, andBooker to Ohio's felony-sentencing structure. It determined that several provisions of that structure mandated, based upon judicial fact finding, imposition of a sentence exceeding the maximum authorized by the facts established solely by a plea of guilty or a jury verdict. Accordingly, it concluded that those provisions violated the Sixth Amendment as made applicable to the states through the Fourteenth *Page 30 
Amendment. Id. at ¶ 61, 64, 67, 80. The court then determined, as the United States Supreme Court had determined in Booker, that the constitutional violation could be remedied by severing and excising the"Blakely-offending portions." Id. at ¶ 96. Once those provisions were excised, trial courts in Ohio were left with discretion to impose any sentence within the statutory range without engaging in judicial fact-finding:
 Accordingly, we have concluded that trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reason for imposing maximum, consecutive, or more than the minimum sentences.
Id. at ¶ 100. Finally, the court declared that, to the extent that Section 2953.08(G) of the Ohio Revised Code, which provided for appellate review of sentences in certain circumstances using "a clear-and-convincing-evidence standard of review," referred to parts of the sentencing structure being excised by the court, it would no longer apply. Id. at ¶ 48, 99.
 {¶ 62} In State v. Windham, 9th Dist. No. 05CA0033, 2006-Ohio-1544, this Court considered the impact of Foster on appellate review of sentencing. It concluded that appellate courts now review criminal sentences that fall within the permissible range of sentences using an abuse of discretion standard.
 {¶ 63} In this case, the trial court determined that Mr. Goff s sexual battery convictions were allied offenses of similar import with his rape convictions and merged into those convictions. It imposed the maximum permissible sentence of ten years imprisonment for each of his two rape convictions and ordered those *Page 31 
sentences to run consecutively. It also sentenced him to five years imprisonment for his child endangering conviction, but ordered that sentence to run concurrently with his sentences for the rape convictions.
 {¶ 64} Mr. Goffs first argument concerning his sentence is that the trial court engaged in judicial fact finding under Section 2929.12(B) of the Ohio Revised Code in violation of his constitutional rights as outlined in Blakely:
 The Ohio Supreme Court [in Foster] decided that Blakely applies to Ohio sentencing law; accordingly, this Court should determine that those parts of R.C. 2929.12(B) which require the Court to make findings of fact when sentencing a defendant under R.C. 2929.12(B) are unconstitutional and those provisions should be severed from the statute.
Appellant's Brief at 20. Section 2929.12(B) contains a list of nine factors that, to the extent they are applicable, a sentencing court is to consider, along with any other relevant factors, as indicating that the offender's conduct was more serious than the conduct normally constituting the offense. Section 2929.12(A) makes it clear that those factors are only to be considered by the court in exercising its discretion. The presence of one or more of the factors does not mandate a longer sentence than would otherwise be applicable:
 [A] court that imposes a sentence under this chapter upon an offender for a felony has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code. In exercising that discretion, the court shall consider the factors set forth in division (B) and (C) of this section relating to the seriousness of the conduct.
 . . .
R.C. 2929.12(A). *Page 32 
 {¶ 65} As discussed above, in Booker, the United States Supreme Court made it clear that the defect that rendered the Federal Sentencing Guidelines unconstitutional was that they were mandatory:
 If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment [W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.
United States v. Booker, 543 U.S. 220, 233 (2005). Section 2929.12 does not go as far as would be permissible under Booker. While the United States Supreme Court in that case recognized that a recommendation of a specific sentence in response to differing sets of facts would be permissible as long as the final decision was left to the trial court's discretion, Section 2929.12 only lists certain factors that are to be considered, along with any other factors the trial court deems appropriate, in exercising its discretion to impose a sentence falling anywhere within the range of possible sentences. In Foster, the Ohio Supreme Court, while not specifically passing on the constitutionality of Section 2929.12, did specifically note that neither Section 2929.12
nor Section 2929.11 of the Ohio Revised Code requires judicial fact-finding:
 It is important to note that there is no mandate for judicial fact-finding in the general guidance statutes. The court is merely to "consider" the statutory factors. *Page 33 
Foster at ¶ 42. The trial court did not violate Mr. Goff s constitutional rights by considering some of the factors listed in Section 2929.12(B) of the Ohio Revised Code in sentencing. To the extent his fifth assignment of error is based on an argument that it did, that assignment of error is overruled.
 {¶ 66} Mr. Goff s second argument in support of his fifth assignment of error is that the trial court abused its discretion by sentencing him to a total of 20 years imprisonment. He has pointed out that, in explaining its sentence, the trial court only mentioned two of the factors listed in Section 2929.12(B):
 In determining that this case was more serious then the normal variety of this offense the Judge determined that [Mr. Goff s stepdaughter] suffered very serious psychological harm and that the defendant used his relationship to perpetrate the offense. Thus, the Court found only two of the eight factors that could make it more serious than the average offense were met in this case.
Appellant's Brief at 20. He has also pointed out that the trial court specifically mentioned that Mr. Goff had been law abiding prior to raping his stepdaughter and that the circumstances under which the offenses had been committed were unlikely to reoccur. According to him, both of these facts reduce the likelihood that he will again commit an offense.
 {¶ 67} In exercising its discretion, the trial court specifically noted the egregious nature of Mr. Goff s crime:
 And I just, again, have to observe that this defendant created a diabolical dilemma for his stepdaughter to work through, I can't imagine a more difficult challenge, forced her to have a child when she was still a child. . . . *Page 34 
 I think another fact of special note here is that the defendant used his relationship to perpetrate the offense. I earlier commented on the cruelty involved, and must further note that this defendant abandoned his parental responsibilities in favor of his self-indulgence, I would say perversion; and of particular concern to the court is that he acted not once in the insemination process, he did it once and he still didn't see the horror, and then he repeated the offense.
The trial court properly considered and weighed various factors regarding Mr. Goff and his offenses. In imposing sentence, it properly exercised its discretion and did not abuse that discretion. To the extent Mr. Goff s fifth assignment of error is based on an argument that it did, that assignment of error is overruled.
 {¶ 68} Mr. Goff s final argument in support of his fifth assignment of error is that the trial court's sentence denied him equal protection because Mrs. Goff received a lesser sentence for her participation in her daughter's rape. He has failed to cite a single authority in support of this argument, other than pointing out that one of the purposes of Ohio's sentencing scheme was to insure that similarly situated defendants were treated similarly. Without implying that this would be a valid argument if Mr. Goff and Mrs. Goff were similarly situated, it is clear that they are not.
 {¶ 69} According to the alleged victim, it was Mr. Goff who compelled her to agree to have his baby by threatening to kill Mrs. Goff. It was Mr. Goff s semen that was injected into his stepdaughter's vagina. On the second occasion, according to his stepdaughter's testimony, Mrs. Goff was not even present and, again according to his stepdaughter's testimony, on that occasion, Mr. Goff had *Page 35 
the stepdaughter "help" him ejaculate. Further, as noted by the trial court in sentencing Mr. Goff, it was Mr. Goff who developed the cover story about a supposed boyfriend who had left for Florida. To the extent his fifth assignment of error is based upon an equal protection argument, it is overruled.
 III. {¶ 70} Mr. Goff s assignments of error are overruled. The trial court's judgment is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30. *Page 36 
Costs taxed to appellant.